**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SOURCE HOME ENTERTAINMENT, LLC, *et al.*,[1] | ) Case No. 14-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF STEPHEN DUBÉ IN SUPPORT OF FIRST DAY MOTIONS**

I, Stephen Dubé, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Source Home Entertainment, LLC ("Holdings"), a company organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the chapter 11 cases currently pending in the United States Bankruptcy Court for the District of Delaware (the "Court").  In such capacity, I have become, and am, generally familiar with the Debtors' overall day-to-day operations, business and financial affairs, and books and records.  I am over the age of 18, competent to testify, and authorized to submit this declaration (this "Declaration") on behalf of the Debtors.

2.      I am a Senior Managing Director of FTI Consulting, Inc., a global turnaround and crisis management firm.  I have more than 20 years of executive management, financial restructuring, and management consulting experience.   I previously served as the Chief Restructuring Officer of Broadstripe, the Chief Restructuring Officer of PRC, LLC, the

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are:  Source Home Entertainment, LLC (8517); Directtou, Inc. (4741); RDS Logistics, LLC (0305); Retail Vision, LLC (2023); Source Interlink Distribution, LLC (3387); Source Interlink International, Inc. (1428); Source Interlink Manufacturing, LLC (7123); and Source Interlink Retail Services, LLC (6967).  The location of the Debtors' corporate headquarters and the service address for all Debtors is:  27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida 34134.

Chief Executive Officer of Birch Telecom, and the President of Core Networks Inc.  I have also served as an on-site operations restructuring officer in the chapter 11 restructurings of CTC Communications and Pacific USA Holdings.

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents, and information supplied to me by other members of the Debtors' management and advisors.  If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

4.      The Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' businesses.  I am familiar with the contents of each First Day Motion, and I believe the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe the relief requested in the First Day Motions will aid in the implementation of a timely and efficient chapter 11 that will preserve and maximize the value of the Debtors' estates.

**Preliminary Statement**

5.      The Debtors are industry leaders in the manufacturing of front-end retail checkout displays and, up to very recently, were one of the leading wholesale distributors of books, periodicals, and other printed material in North America.  Headquartered in Bonita Springs, Florida, the Debtors are comprised of two primary units:  (a) the distribution business, which was primarily operated by Source Interlink Distribution, LLC ("Source Distribution");  and (b) the retail checkout display manufacturing business (the "Retail Display Business"), which is primarily operated by Source Interlink Manufacturing, LLC ("Source Manufacturing").  Through their distribution business, the Debtors operated a

2

distribution network that spanned over 32,500 retail locations in the U.S. and abroad, including, among others, leading mass merchandise retailers, grocery stores, bookstore chains, drug stores, and other specialty retailers.[2]  Through their Retail Display Business, the Debtors continue to design, manufacture, and install front-end retail display fixtures and manage rebates and other sale incentive programs for certain retailer and publisher customers.  As of March 31, 2014, the Debtors listed total assets (not including goodwill or intangibles) of approximately $205 million and total liabilities of approximately $290 million.

6.      The continuing fundamental technological shift away from traditional consumption of print media towards online magazines and e-book readers, as well as the continuing overhang of the economic downturn, created a difficult operating environment for distributors of print media.  The Debtors, like many wholesalers, have attempted to cope with the substantial reduction in retail print consumption while running on narrow profit margins resulting from intense competition for retailer contracts.  Indeed, over the course of just 19 years, the number of wholesalers fell from approximately *400* in 1995 to *just three* major wholesalers in 2014 (including the Debtors).

7.      The intense competition among wholesale distributors also saddled the Debtors with unsustainable distribution agreements with the Debtors' national distributors and publishers who supplied the Debtors with product (collectively, the "Distribution Agreements").  Among other things, the Distribution Agreements allowed suppliers to impose an artificially high volume of magazines upon the Debtors (*i.e.*, amounts vastly greater than would ever be sold at retail), and the Debtors' inability under the Distribution Agreements to determine how many magazines

---

[2]    As more fully discussed below, the Debtors began winding down active operations with respect to their distribution business in late May.  At this time, the Debtors' distribution business is dedicated to accounts receivable and related collection activities.

they could afford to purchase—coupled with their inability to modify inefficient and costly mechanisms for processing return credits—drained the Debtors of the liquidity necessary to run their distribution operations efficiently and profitably.  In short, similar to the experiences of other failed wholesalers in the industry, the Debtors were required to pay for far more magazines than their retailers could ever sell and—as the only way to obtain necessary return credits against future purchases—forced to retrieve, transport, and destroy the unsold copies at a substantial cost.

8.      Faced with a series of liquidity crises and the prospect of being unable to continue operations under their existing Distribution Agreements, the Debtors re-engaged in negotiations in January 2014 with their major national distributors and publishers in the hopes of effectuating a more efficient magazine and publication distribution system.  These negotiations continued for several months, and in late May 2014, the Debtors had reached agreements in principle with certain of its national distributors and were in the process of finalizing term sheets and associated contracts with certain other industry participants that would have provided the Debtors with, among other things, additional liquidity and a feasible path forward for their distribution business.  Unfortunately, on May 25, 2014, the Debtors' largest publisher unexpectedly pulled out of negotiations with respect to an almost finished term sheet and ceased shipping product to the Debtors.  Following this development, the Debtors were forced to begin immediately winding down their distribution business operations, making the difficult determination to lay off substantially all of their distribution-affiliated employees.

9.      At the same time, isolated from the Debtors' deteriorating distribution business, the Debtors' other primary business unit, the Retail Display Business, has remained profitable.  Accordingly, to preserve and maximize value, the Debtors sought to implement the sale of the

Retail Display Business in connection with a chapter 11 filing.  To that end, over the past two weeks, the Debtors have engaged in substantial, good faith, arm's-length discussions with certain of their lenders under the Term Loan Facility (as defined herein) (a designee of the Term Loan Agent (as defined herein), the "Purchaser"), regarding the Purchaser's role as a stalking horse in an auction for the Retail Display Business.[3]  These discussions culminated in the parties' entry into a purchase agreement (the "Purchase Agreement"), as more fully described herein, pursuant to which the Purchaser would act as the stalking horse in a public auction for all or substantially all of Source Manufacturing's assets and any other assets related to the Retail Display Business owned by other Debtors, with the remainder of the Debtors' assets to be administered through a chapter 11 plan of liquidation.  The Debtors plan to file a motion seeking authorization of the sale and related bidding procedures as soon as reasonably practicable after the Petition Date.  Accordingly, the Debtors have commenced these chapter 11 cases to facilitate a timely and efficient sale and liquidation plan process that will monetize the value of the Debtors' estates and distribute the proceeds to the Debtors' creditors.

10.    To familiarize the Court with the Debtors and the relief the Debtors seek in the First Day Motions, this Declaration is organized into three parts.  Part I provides an overview of the Debtors' corporate history, operations, and capital structure.  Part II summarizes the events leading to the commencement of these chapter 11 cases.  Part III sets forth the relevant facts supporting the relief requested in the First Day Motions.

---

[3]    Certain of the lenders participating in these negotiations are GoldenTree Asset Management, L.P., who along with certain of its affiliated funds, holds approximately 80.0% of the equity in Holdings, approximately 50.0% of the debt under the Term Loan Facility, and has 4 out of 7 of the representatives on the Debtors' board of directors.

<u>**Part I:  The Debtors**</u>

I.    **Overview of the Debtors' Corporate History and Business Operations**

  A.    **Corporate History**

  11.    Prior to the October 2013 Restructuring (as defined below), the Debtors were the logistics and distribution business segment of Source Interlink Companies, Inc. ("<u>Source Interlink Companies</u>"), a leader in the print and digital magazine publishing business and in the distribution of magazines, books, and other printed publications.  In addition to the Debtors' distribution business, Source Interlink Companies' other primary business division was Source Interlink Media, LLC ("<u>Source Media</u>").  Source Media produced print and digital content for consumers in both North America and abroad under a variety of enthusiast brands, including *Motor Trend* and *Hot Rod*, via a number of media platforms, including print, digital, mobile applications, and social media.

  12.    In October, 2013, on account of, among other things, decreased demand for print media and upcoming maturities in its debt documents, Source Interlink Companies undertook a corporate reorganization (the "<u>October 2013 Restructuring</u>") which substantially deleveraged Source Distribution and separated it from Source Media.  Source Interlink Companies continues to hold Source Media and its subsidiaries and operate the media content and publishing businesses, while Holdings, Source Interlink Companies' parent company prior to the October 2013 Restructuring, became the direct parent company of Source Distribution.

  13.    The events surrounding the October 2013 Restructuring, as well as developments since then, are described in Part II hereof.

B.     **Business Operations**

1.     **Overview**

14.     The Debtors are privately held and operated a domestic and international distribution network for domestic and international periodicals, books, and other printed material, manufacture retail checkout displays, and provided fulfillment and returns processing services to approximately 32,500 retail locations throughout the United States.  In the twelve months ended April 30, 2014, the Debtors generated revenues totaling approximately $600 million on a consolidated basis.

15.     The Debtors' customers include many of the nation's leading retailers, such as Barnes & Noble, Wal-Mart, Costco, CVS, Safeway, Supervalu, Target, and Walgreens.  As of 2014, the Debtors' share of the single-copy magazine distribution market in the U.S. was approximately 30%.  The Debtors were also the leading importer of foreign publications to the U.S. and exporter of periodicals to markets worldwide.

16.     As mentioned above, the Debtors are comprised of two primary operating units: (a) the distribution business, which was operated primarily by Source Distribution and its subsidiaries; and (b) the checkout and front-end retail display manufacturing business, which is operated by Source Manufacturing.

17.     Source Distribution and its subsidiaries were the entities primarily responsible for operating the Debtors' distribution network for domestic periodicals, including single-copy (*i.e.*, non-subscription) magazine distribution, as well as offering certain in-store services to retailers and wholesalers in the United States and Canada.

18.     In addition to Source Distribution, Source Interlink International, Inc. ("Source International") was the leading international importer and exporter of periodicals. Source International exported domestic titles to more than 100 markets worldwide and imported

more than 1,400 foreign titles to the United States and Canada.  Through a joint venture with Curtis Circulation Company, LLC ("Curtis"), Source International also offered a global export marketing service for U.S. publishers with a portfolio in excess of 700 titles and a reach that included key markets such as the United Kingdom, Continental Europe, the Far East, Australia, Mexico, the Caribbean, and overseas U.S. military installations.[4]

19.    Finally, Source Manufacturing (which, as noted above, continues to operate) is the market-leading manufacturer of wire-based checkout displays, recognized for its expertise in the design, construction, shipping, and installation of custom wire fixtures and other retail front-end displays for major retail chains.  Source Manufacturing manufactures approximately 60% of the checkout fixtures in the United States.

### 2.    The Debtors' Customers and Suppliers

20.    The Debtors' customers are comprised primarily of various national, regional, and local retailer chains.  Certain of these retailers utilized the Debtors as their exclusive wholesale distributor nationwide—such as CVS and Costco Wholesale Corporation—whereas other retailers conducted business with the Debtors based on geographic clusters where the Debtors had a comprehensive logistics network.  Examples of the latter include Walmart, Walgreens, Safeway, Supervalu, and Target stores.

21.    The Debtors and their retailer customers relied on goods and services provided by their suppliers to maintain competitive operations.  The Debtors obtained the vast majority of their magazine distribution supply pursuant to Distribution Agreements with four national

---

[4]    The joint venture is an entity named International Circulation Services, LLC ("ICS"), which is not a Debtor in these chapter 11 cases.  Source International and Curtis each own 50% of the equity in ICS and are in the process of winding down ICS's operations.  ICS is reflected on the Debtors' corporate structure chart attached hereto as **Exhibit A**.

distributors:  (a) Comag Marketing Group, LLC; (b) Curtis; (c) Kable Distribution Services, Inc.; and (d) Time/Warner Retail Sales & Marketing, Inc. ("TWRS").  As will be discussed in further detail below, the Debtors' inability to restructure these Distribution Agreements necessitated the Debtors' commencement of these chapter 11 cases.

### 3.    The Debtors' Distribution Network and Supply Chain

22.    The Debtors' distribution centers—located in (a) Lancaster, Pennsylvania, (b) McCook, Illinois, and (c) Ontario, California—and nationwide depots were a central element in their distribution network.  Currently, the Debtors lease approximately 830,000 square feet of distribution centers, warehouses, and depots throughout the U.S. and Canada.

23.    In addition to their employees, the Debtors relied (and, in the case of their Retail Display Business, continue to rely) heavily on outsourced freight carriers and logistics service providers, including UPS and certain other third-party delivery companies, for both the distribution of a significant portion of their products from their distribution centers and depots to retail locations, as well as the retrieval and transportation of unsold products to central locations for counting, returns-credit processing, and destruction. The Debtors' international distribution network also used a series of domestic and international freight forwarding vendors to import and export their products, clear customs, and pay applicable taxes and tariffs.  Finally, the Debtors also provided in-store merchandising services to a majority of their clients' retail locations through a field services workforce of merchandisers who put new products on display, took expiring products off the shelves, and re-stocked and prepared unsold products for return pick-up.

### 4.    The Debtors' Employees

24.    The Debtors currently employ 166 full-time employees, who are divided between the Debtors' active Retail Display Business (79 employees located primarily at

Source Manufacturing's 300,000 square foot Rockford, Illinois facility) and the remaining employees overseeing the wind-down of the Debtors' estates (87 employees located primarily at the Debtors' Bonita Springs, Florida and Lisle, Illinois offices). The employees overseeing the Debtors' wind-down efforts are primarily tasked with providing accounting, finance, and information technology functions to bill customers and collect receivables, secure and sell assets, and wind-up the Debtors' distribution business in the near term, in addition to performing accounting and administrative functions in support of the Retail Display Business. None of the Debtors' current employees is subject to a collective bargaining agreement. As noted above, on May 30, 2014, the Debtors conducted a significant reduction in their workforce upon the cessation of distribution operations, laying off more than 5,000 full- and part-time employees. The Debtors' current staffing level reflects this significant headcount reduction.

### 5.    Shared Services

25.    At present, the Debtors receive certain administrative services at cost from Source Interlink Companies pursuant to the Transition Services Agreement, dated as of October 9, 2013, and amended as of May 1, 2014, by and between Source Interlink Companies and Source Distribution (the "Transition Services Agreement"). Under the Transition Services Agreement, Source Interlink Companies provides Source Distribution with, among other things, human resources administration, payroll, premises management, and tax and insurance management services. In addition, pursuant to the Services Agreement, dated as of April 30, 2014, by and between Source Distribution and Source Media, Source Distribution provides Source Media with certain accounts receivable management services for a monthly fee in the amount of $12,000. Although the Debtors intend to continue operating under both the Transition Services Agreement and the Services Agreement on a postpetition basis, the Debtors are not seeking to assume such agreements at this time.

## II.     The Debtors' Corporate and Capital Structure

26.     The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit A**.[5]   As set forth on **Exhibit A**, Source Distribution and Source International are wholly-owned by Holdings, and Source Manufacturing in turn is wholly-owned by Source Distribution.[6]   As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $65.1 million and consisted of, among other things, the Revolving Credit Facility, the Term Loan Facility, the Coral Springs Mortgage, and the Time Promissory Note (each as defined below).   As of the Petition Date, the Debtors' funded debt obligations are summarized as follows:

| Facility | | ($ millions) |
|---|---|---|
| Revolving Credit Facility | | $    --[7] |
| Term Loan Facility | | $ 51.9 |
| Coral Springs Mortgage | | $ 12.6 |
| Time Promissory Note | | $  0.6 |
| | **Total:** | **$ 65.1** |

27.     The primary components of the Debtors' consolidated funded debt obligations are described below.

---

[5]   As discussed more fully herein, the Debtors own all or a percentage of three entities who are not Debtors in these chapter 11 cases:  (a) ICS; (b) Magazine Information Network, LLC ("Magnet"); and (c) The Source Canada Corp., an entity with no assets or operations.

[6]   Source Distribution also owns approximately 27.4 percent of Magnet, a company owned and operated by several wholesale distributors for the purpose of single-copy magazine sales information sharing and distribution.  Ownership is re-calculated intermittently based on wholesale distributor market share (*i.e.*, the amount of magazines sold and delivered).   Accordingly, given the Debtors' prepetition wind-down of their distribution business, the Debtors expect Source Distribution's equity percentage to decrease upon the next ownership calculation.

[7]   As discussed more fully below, approximately $17.6 million of letters of credit have been issued under the Revolving Credit Facility.  Prior to the Petition Date, the Revolving Credit Agent curtailed drawdowns under the Revolving Credit Facility and swept the Debtors' cash in an amount equal to approximately $18.5 million, or 105% of the face amount of all outstanding letters of credit.

A.      **The Revolving Credit Agreement**

28.      Each Debtor is party to the Amended and Restated Revolving Credit Agreement, dated as of October 4, 2013 (as may be amended from time to time and with all supplements and exhibits thereto, the "Revolving Credit Agreement"), by and between each of the Debtors other than Holdings as borrowers, Holdings as guarantor, the lenders party thereto from time to time (collectively, the "Revolving Credit Lenders"), and Wells Fargo Capital Finance, LLC, as administrative and collateral agent ("Wells Fargo" or the "Revolving Credit Agent").   The Revolving Credit Agreement provided the Debtors with a revolving asset based loan credit and letter of credit facility with a maximum availability of $35 million, subject to a monthly borrowing base determination (the "Revolving Credit Facility").   As of the Petition Date, there were no borrowings under the Revolving Credit Facility.

29.      As part of the Revolving Credit Facility, the Debtors have issued approximately $17.6 million of letters of credit used to provide credit support for, among other things, the Debtors' workers' compensation policies (collectively, the "Letters of Credit").   As of the Petition Date, one vendor has drawn down approximately $341,000, leaving an undrawn balance of $17.3 million of Letters of Credit.   Obligations arising under the Revolving Credit Facility are secured by substantially all of the Debtors' assets, subject to customary limited exceptions and exclusions and the Intercreditor Agreement (as defined herein).

30.      As noted above, prior to the Petition Date, Wells Fargo withheld approximately $18.5 million of the Debtors' cash and is currently cash collateralized in an amount equal to approximately 105% of the aggregate face amount of all obligations outstanding under the Revolving Credit Facility.

KE 31270265

### B.        The Term Loan Agreement

31.        Each Debtor is party to the Term Loan Agreement, dated as of October 4, 2013 (as may be amended from time to time and with all supplements and exhibits thereto, the "Term Loan Agreement"), by and between Source Distribution as borrower, each of the other Debtors as guarantors, the lenders party thereto from time to time (collectively, the "Term Loan Lenders"), and Cortland Capital Market Services, LLC, as administrative and collateral agent (the "Term Loan Agent", and together with the Revolving Credit Agent, the "Collateral Agents").    The Term Loan Agreement provides the Debtors with a term loan (the "Term Loan") in the aggregate amount of $50 million (the "Term Loan Facility").  As of the Petition Date, there were approximately $51.9 million in aggregate principal amount outstanding under the Term Loan Facility.

32.        Amortization under the Term Loan Facility is approximately $1 million per year, and interest is payable quarterly in-cash or in-kind at the Debtors' election.  Obligations arising under the Term Loan Facility are secured by substantially all of the Debtors' assets, subject to customary limited exceptions and exclusions and the Intercreditor Agreement.

### C.        Intercreditor Agreement

33.        The Debtors are party to the Intercreditor Agreement, dated as of October 4, 2013, by and between the Debtors and the Collateral Agents, which sets forth the relative priority of the Collateral Agents' liens on the Debtors' assets, as well as certain other rights, priorities, and interests related thereto.

34.        The Intercreditor Agreement divides the collateral set forth in the Revolving Credit Agreement and the Term Loan Agreement into two pools consisting generally of:  (a) the Debtors' stock, equipment, real estate assets and fixtures (subordinate to any mortgages on such real estate assets and fixtures), and general intangibles (relating to such stock, equipment, and

13

real estate assets and fixtures) (collectively, the "Fixed Asset Collateral"); and (b) all of the Debtors' other assets or property, whether real, personal, or mixed (collectively, the "Current Asset Collateral").  The Intercreditor Agreement grants:  (x) the Term Loan Lenders (i) a first priority lien on the Fixed Asset Collateral and (ii) a second priority lien on the Current Asset Collateral; and (y) the Revolving Credit Lenders (i) a first priority lien on the Current Asset Collateral and (ii) a second priority lien on the Fixed Asset Collateral.  The Intercreditor Agreement also imposes certain limitations on, among other things, the rights and remedies available to the Collateral Agents in an event of default and the ability of the Collateral Agents to challenge the validity or priority of each other's liens.

### D.    Other Funded Debt Obligations

#### 1.    Coral Springs Mortgage

35.    Source Distribution is party to a loan agreement and related promissory note, dated as of October 12, 2005, by and between Source Distribution and Wachovia Bank, National Association ("Wachovia"), in the amount of approximately $20 million (the "Coral Springs Loan").  Obligations outstanding under the Coral Springs Loan mature on October 13, 2015. The Coral Springs Loan is secured by a mortgage and security agreement, dated as of October 12, 2005, by and between Source Distribution and Wachovia, on the real property located at 4250 Coral Ridge Drive, Coral Springs, Florida (the "Coral Springs Mortgage").  The Coral Springs Mortgage is guaranteed by Source Interlink Companies, Source Distribution's previous parent corporation, pursuant to the Guaranty dated as of October 12, 2005, by and between Source Interlink Companies and Wachovia.  As of the Petition Date, approximately $12.6 million remains outstanding under the Coral Springs Loan.  The Debtors estimate that the appraisal value of the Coral Springs Property meets or exceeds amounts owed under the Coral Springs Loan.

14

### 2. Time Promissory Note

36.     On May 10, 2005, Source Distribution issued an unsecured promissory note in the amount of approximately $9.1 million to TWRS (the "Promissory Note").    Interest on the Promissory Note accrues at 5.00% per year, and obligations under the Promissory Note mature on August 31, 2014.    The Promissory Note is guaranteed by Source Interlink Companies pursuant to the Guarantee Agreement, dated as of May 10, 2005, by and between Source Interlink Companies and TWRS.    As of the Petition Date, a single amortization payment of approximately $600,000 remains outstanding under the Promissory Note.

### Part II:  Events Leading to these Chapter 11 Cases

### A.    October 2013 Restructuring

37.     In October 2013, each of the Debtors, along with certain of their then-affiliates, entered into an out-of-court debt-for-equity swap with their secured lenders.    The principal factors necessitating the commencement of the October 2013 Restructuring included the same issues plaguing the Debtors today—namely, the lingering effects of the global economic recession, decreased consumer demand for print periodicals, narrow margins on retail sales, and highly unfavorable arrangements with the Debtors' national distributors and publishers.  Prior to the October 2013 Restructuring, the Debtors were jointly and severally liable with Source Interlink Companies and Source Media on approximately $500 million of secured long-term debt.  Pursuant to the October 2013 Restructuring, the Debtors were separated from Source Interlink Companies and Source Media and eliminated approximately $436 million of debt in the process.

### B.    Challenging Operating Environment

38.     Although the Debtors emerged from the October 2013 Restructuring with substantially less debt, the Debtors' actual performance did not meet their business plan and

financial forecasts due to, among other things:  (a) accelerated steep declines that the traditional print media industry continued to suffer; (b) intense competition for retailer customers; and (c) difficulty in modifying the highly unfavorable Distribution Agreements the Debtors are party to with their national distributors and publishers.

### 1.    Economic Environment

39.    Consumer demand for print media has declined precipitously—as evidenced by the recent returns to bankruptcy for both Reader's Digest Association, Inc. and Houghton Mifflin Harcourt Publishing Company, as well as chapter 11 filings by Borders Group, Inc., Dex One Publishing, American Media, Inc., and chapter 7 filings by, among others, Anderson News Group, Inc.[8]—while consumption of online and digital content has increased exponentially.  Two of the largest legacy print platforms—newspapers and magazines—have experienced year-over-year revenue declines since 2009.  Readers are migrating quickly to digital and mobile platforms, a move that accelerated in 2011 with the explosion of tablet and smart phone ownership and continues to increase.  This migration has been compounded by the sluggish growth of the U.S. economy, in which consumers have been reluctant to spend their dollars on print media.

40.    The Debtors also experienced a number of other setbacks in addition to the structural shift in media consumption.  In 2011, as noted above, Borders Group, Inc.—a major customer who utilized the Debtors as their sole-source wholesale distributor for magazines— filed for bankruptcy and liquidated their stores, representing a $48 million reduction in revenue

---

[8]    *See In re RDA Holding Co.*, No.. 13-22233 (Bankr. S.D.N.Y.); *In re Houghton Mifflin Harcourt Publ'g Co.*, No.. 12-15610 (Bankr. S.D.N.Y.); *In re Borders Grp., Inc.*, No.. 11-10614 (Bankr. S.D.N.Y.); *In re Dex One Corp.*, No.. 13-10533 (Bankr. D. Del.); *In re Am. Media, Inc.*, No.. 10-16140 (Bankr. S.D.N.Y.); and *In re Anderson News, LLC*, No.. 09-10695 (Bankr. D. Del.).

for Source Distribution and a corresponding $6 million decline in EBITDA.  In addition, Kroger and Albertsons, other significant customers of the Debtors, moved their magazine supply and in-store merchandising to different wholesalers, requiring the Debtors to conduct a substantial reduction in force.  These losses were accompanied by, among other things, refusal by one of the Debtors' key national distributors to pay over $1 million in owed compensation, increases in the costs of fuel and other raw materials, continued same store sales declines for Source Distribution, lower worldwide sales by Source International, and lower-than-expected production from Source Manufacturing.

41.    These developments negatively impacted the Debtors' revenue, which declined from approximately $824.5 million to approximately $600 million from 2010 to 2014.  While the Debtors attempted to address their respective revenue decline, they were less successful than they had anticipated.  The Debtors' distribution business was, by its nature, devoted to distribution of printed material (*e.g.*, magazines, newspapers, books, and other types of print publications).  But consumer demand for such material continued to decline across the board. Compounding the effects of this trend, the Debtors were only partly successful in adjusting their costs to declining business volumes.  Despite substantial initiatives to address costs, a significant share of the Debtors' costs were downwardly inflexible.  For example, falling sales of individual titles did not result in fewer deliveries or proportionate reductions in the number of containers shipped to a store.  This negative impact on cash flow constrained the Debtors' ability to invest in necessary capital expenditures, as well as the Debtors' ability to service their debt.  At the same time, the Debtors were unable to effectively raise prices or reduce the number of publications they purchased to offset their high fixed costs and declining revenue because

publishers fix both the amount of magazines a wholesaler must purchase as well as the magazine cover prices.

### 2.    Retailer Customers

42.    The decline in overall demand for print media also led wholesale distributors, such as the Debtors, to compete intensively for retailer customers.  In stores, the magazine and book category competes for shelf space allocated by retailer chains among multiple merchandise categories based on sales productivity, profitability, and a store's overall product mix.  As a result, competition on price and services has pushed wholesaler distributors to improve the economics for retailer customers over time and constrained opportunities to pass on cost increases to retailers.

### 3.    Distribution Agreements

43.    The Debtors' ability to manage through the challenges arising from the prevailing economic environment has been materially affected by the Debtors' Distribution Agreements. Indeed, the Distribution Agreements, in conjunction with the decrease in consumer demand and economic overhang more generally, are primary drivers of wholesale distributor failures in the recent years, including that of the Debtors.

44.    Typically, major publishers publish magazines and set their cover prices.  To effectuate single-copy magazine sales, each publisher retains a national distributor to serve as a broker whose function is to manage the publisher's relationships with its wholesalers and, in some cases, guarantee the wholesalers' payment obligations to the publisher.  National distributors are compensated with a percentage of the retail sales value of the magazines they deliver to wholesalers.  Pursuant to allotment orders provided by the national distributor (which, as discussed below, exceed the number ultimately purchased by consumers), the publishers' magazines are shipped to wholesalers, who, in turn, ship the magazines to retailers.  Wholesalers

KE 31270265

are responsible for merchandising (display and removal), picking up, transporting, counting, tabulating, and destroying copies of magazines that remain unsold.

45.     This process has introduced gross inefficiencies into the distribution market that have imposed onerous and unnecessary costs on wholesalers such as the Debtors.  For example, because a national distributor is allowed to allocate the number of magazines or other printed material the Debtors must purchase under the Distribution Agreements, publishers and national distributors flood a marketplace with quantities of magazines that far exceed what is sold by a retailer to ensure broader retail display of their products.   The Debtors and their retailers are thus forced to purchase, transport, and carry a glut of magazines that are never expected to be sold.  In order to offset the costs of over-purchasing these products, the Debtors and their retailers are allowed to take return credits against their next purchase for unsold product.   However, the Debtors may only take advantage of these return credits if, at their own cost, they pick up unsold inventory from each retail location, transport them back to a distribution center or other location, process the returns, and then destroy the product—an unnecessary and inefficient process that costs the Debtors a considerable amount of time and money.  In addition, the Debtors are forced to absorb the full cost for unsold products which are accidentally destroyed or lost by a retailer (commonly referred to as "shrink" in the industry).

46.     As discussed in further detail below, in light of decreased consumer demand and more intense competition for retailer customers, the Distribution Agreements' onerous terms—together with the decision of one publisher in particular to abandon at the eleventh hour what had been promising negotiations and cease supplying the Debtors with product—ultimately resulted in the Debtors' wind-down of their distribution operations and commencement of these chapter 11 cases.

**C.      Restructuring Initiatives and Prepetition Contract Negotiations**

47.      Following the October 2013 Restructuring, the Debtors implemented a new business plan to combat the prevailing economic environment and issues under the Distribution Agreements by, among other things, adding new retailer customers, expanding their Retail Display Business and merchandising services business, and reducing operating costs.  While certain of the Debtors' business initiatives achieved operating improvements, the Debtors were unable to overcome the inability to operate profitably under the existing Distribution Agreements.  Recognizing this fact, the Debtors and their advisors engaged in substantive negotiations with their national distributors and publishers to modify the Distribution Agreements prior to the Petition Date.

48.      Although the Debtors had made repeated efforts to engage their national distributors and publishers on modified terms for years prior to the Petition Date, in January 2014, the Debtors engaged in direct and focused discussions with their four largest national distributors and certain of the publishers that they represent to realize their long-sought objective of obtaining changes in the economic and operational terms of the Distribution Agreements. These discussions took place over a four month period between mid-January and mid-May 2014.  Faced with an inability to finance operating losses and insufficient financial resources to pay amounts owing to all their creditors, including the Debtors' national distributors, the Debtors were unable to make approximately $30 million of payments to their largest national distributors in late April and early May of 2014.  Nevertheless, the Debtors continued to seek to work constructively with their business partners to effectuate a restructuring of the Distribution Agreements in the hope that revised contractual terms would provide the Debtors with the necessary liquidity to operate as a going concern.  To that end, by May 2014, the Debtors had reached agreements in principle with certain of their national distributors and

were in the process of finalizing term sheets and associated contracts with certain other industry participants that would have provided the Debtors with, among other things, additional liquidity and a feasible path forward for their distribution business.  In particular, the Debtors engaged their largest publisher and national distributor, given their importance to the Debtors' supply chain and cost structure as a whole.  Despite the publisher and national distributor's indications of willingness to enter into modified contractual arrangements with the Debtors and to support the Debtors' efforts to engage with other publishers, on May 25, 2014, without notice and at a time when the Debtors believed a fully-negotiated term sheet was close to execution, the publisher sent a letter to the Debtors withdrawing from all negotiations, terminating its subsidiary's Distribution Agreement, and immediately discontinuing its sale of publications.

49.    Without a Distribution Agreement with their largest publisher and national distributor—and despite substantial progress in their negotiations with other of its critical suppliers—the Debtors' wholesale distribution business was simply unable to continue as a going concern.  Accordingly, the Debtors immediately began winding down their distribution operations, making the difficult determination to lay off approximately 5,500 employees who were not needed for the Retail Display Business nor necessary to monetize the Debtors' other assets.  At the same time, the Debtors entered into discussions with Wells Fargo regarding the Debtors' consensual use of cash collateral to help fund a chapter 11 case and sale process. Despite efforts by both parties, these negotiations were ultimately unsuccessful, and Wells Fargo withheld approximately $12 million of the Debtors' cash.  As noted above, together with approximately $6.5 million of cash previously withheld, Wells Fargo is currently cash collateralized in an amount equal to approximately 105% of the aggregate face amount of obligations outstanding under the Revolving Credit Facility.

**D.      Proposed Sale**

50.     Since commencing the wind-down of their distribution operations, the Debtors have continued to engage in discussions and negotiations surrounding various restructuring transactions in an effort to maximize stakeholder value.  In particular, the Debtors entered into extensive arm's-length discussions with their Term Loan Lenders regarding the potential acquisition of the Retail Display Business through a credit bid of all or part of the Term Loan. These discussions culminated in the parties' entry into the Purchase Agreement whereby the Term Loan Lenders have agreed to serve as a stalking horse for the sale of the Retail Display Business.

51.     To that end, the Debtors intend to file a motion (the "Sale Motion"), as soon as reasonably practicable after the Petition Date, seeking authorization of a sale, pursuant to the Purchase Agreement, of substantially all of Source Manufacturing's assets to the Purchaser free and clear of all claims, liens, and other encumbrances pursuant to section 363 of the Bankruptcy Code.  As part of the Sale Motion, the Debtors will also file proposed bid procedures to be used in the Auction.  The Debtors hope that the proposed Auction and sale process will attract additional potential purchasers and create value for the Debtors' estates.

52.     In addition, the Debtors intend to file their proposed chapter 11 plan as soon as reasonably possible.  The Debtors anticipate using any proceeds from the Auction and sale process, any additional cash receipts collected, and the monetization of their remaining assets to administer these chapter 11 estates, fund creditor recoveries, and bring these chapter 11 cases to a prompt conclusion.

KE 31270265

**Part III:  First Day Motions**

53.    To minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' ability to effectuate a timely and efficient sale and plan process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed or will file requests for various types of relief in their First Day Motions. I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable the Debtors to preserve and maximize value and efficiently implement their asset monetization and wind-down process with minimal disruption and delay.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 31270265

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated:  June 23, 2014
Bonita Springs, Florida

Name: Stephen Dubé
Title:   Chief Restructuring Officer
Source Home Entertainment, LLC

# EXHIBIT A

**Corporate Organization Chart**

## Corporate Organizational Chart

