## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SOURCE HOME ENTERTAINMENT, LLC, *et al.*,[1] | ) Case No. 14-11553 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 12** |

## INTERIM ORDER (A) AUTHORIZING
## POSTPETITION USE OF CASH COLLATERAL,
## (B) GRANTING ADEQUATE PROTECTION TO THE SECURED PARTIES,
## (C) SCHEDULING A FINAL HEARING PURSUANT
## TO BANKRUPTCY RULE 4001(B), AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (a) authorizing the Debtors to use the Cash Collateral (as defined herein); (b) providing adequate protection with respect to any diminution in value, if any, of the respective interests of the Term Loan Agent and Revolving Credit Facility Agent (each as defined herein) as may result from the use of the Cash Collateral; (c) scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") granting the relief requested in the Motion on a final basis pursuant to the final order (the "Final Order"); and (d) granting related relief.

The Court having considered the Motion, the First Day Declaration, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on June 24, 2014 (the "Interim Hearing"); and notice of the Interim Hearing having been given in

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Source Home Entertainment, LLC (8517); Directtou, Inc. (4741); RDS Logistics, LLC (0305); Retail Vision, LLC (2023); Source Interlink Distribution, LLC (3387); Source Interlink International, Inc. (1428); Source Interlink Manufacturing, LLC (7123); and Source Interlink Retail Services, LLC (6967). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida 34134.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014; and the Interim

Hearing to consider the interim relief requested in the Motion having been held and concluded;

and all objections, if any, to the interim relief requested in the Motion having been withdrawn,

resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief

requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates

pending the Final Hearing, and otherwise is fair and reasonable, in the best interests of the

Debtors, their estates, and their creditors and equity holders, and essential for the continued

operation of the Debtors' remaining business; and after due deliberation and consideration, and

for good and sufficient cause appearing therefor;

**IT IS HEREBY APPROVED BY THE COURT, AS FOLLOWS:**

A.      Petition Date.  On June 23, 2014, (the "Petition Date"), each of the Debtors filed a

voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code (such

chapter 11 cases, the "Cases").

B.      Debtors in Possession.  The Debtors continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      Jurisdiction and Venue.  This Court has jurisdiction over these proceedings, and

the persons and properties affected hereby, pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core proceeding pursuant to 28

U.S.C. § 157(b).

D.      Creditors' Committee.  As of the date hereof, the United States Trustee for the

District of Delaware (the "U.S. Trustee") has not yet appointed an official committee of

unsecured creditors in the Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

E.    Debtors' Representations.  Without prejudice to any other party's rights to assert claims, counterclaims or causes of actions, objections, contests, or defenses prior to expiration of the Challenge Period as set forth in Paragraph 4 hereof, the Debtors represent, admit, stipulate, and agree (collectively, the "Debtors' Stipulations") as follows:

a.    Cash Collateral.  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors and any amounts generated by the collection of accounts receivable, the sale of inventory, or other disposition of the Prepetition Collateral (as defined herein) existing as of the Petition Date, and the proceeds of any of the foregoing is the Secured Parties' (as defined herein) cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"); *provided*, that the Revolving Cash Reserve held by the Revolving Credit Facility Agent (as each term is defined herein) shall not be deemed to be Cash Collateral and shall not be available for use by the Debtors for any purpose, including without limitation, to fund the Carve-Out or to otherwise pay or fund Professional Fees (as defined below); *provided, further*, that the Debtors reserve their rights to seek the return of any portion of the Revolving Cash Reserve remaining after the indefeasible payment and satisfaction in full of the Debtors' Revolving Obligations (as defined below), and the Revolving Credit Facility Agent reserves all rights to contest such rights.

b.    Term Loan Facility.  The Debtors are parties to that certain Term Loan Agreement, dated as of October 4, 2013 (as amended, the "Term Loan Agreement," and together with the other Credit Documents, as defined in the Term Loan Agreement, the "Term Loan Credit Documents"), by and between Source Interlink Distribution, LLC, as Borrower; Source

Home Entertainment, LLC, Source Interlink International, Inc., Retail Vision, LLC, Source Interlink Manufacturing, LLC, Source Interlink Retail Services, LLC, RDS Logistics, LLC, and Directtou, Inc., as Guarantors; the lenders identified on the signature page thereto (the "Term Loan Lenders"); and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent for the Term Loan Lenders (in such capacity, the "Term Loan Agent"), which provides for a term loan in the original principal amount of $50,000,000. As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Term Loan Lenders under the Term Loan Credit Documents in the aggregate principal amount of not less than approximately $51.9 million, which includes both the original principal and principal on account of interest paid in kind.

c.     Term Loan Security Agreement.   In connection with the Term Loan Agreement, the Debtors entered into that certain Pledge and Security Agreement, dated as of October 4, 2013 (as amended, the "Term Loan Security Agreement"), by and between the Debtors, as Grantors, and the Term Loan Agent, as agent for the Term Loan Lenders. Pursuant to the Term Loan Security Agreement, each Debtor granted a security interest in substantially all the Debtors' assets other than real property (the "Prepetition Collateral") to the Term Loan Agent as security for the Secured Obligations (as defined in the Term Loan Security Agreement, the "Term Loan Secured Obligations").

d.     Revolving Credit Facility.   The Debtors are parties to that certain Amended and Restated Revolving Credit Agreement, dated as of October 4, 2013, as amended by Amendment No. 1 to Amended and Restated Revolving Credit Agreement, dated as of January 31, 2014 (as amended, the "Revolving Credit Agreement," and together with the other Credit Documents, as defined in the Revolving Credit Agreement, the "Revolving Credit

Documents," and together with the Term Loan Credit Documents, the "Credit Documents"), by and between Source Interlink Distribution, LLC, Source Interlink International, Inc., Retail Vision, LLC, Source Interlink Manufacturing, LLC, Source Interlink Retail Services, LLC, RDS Logistics, LLC, and Directtou, Inc., as Borrowers; Source Home Entertainment, LLC, as a Guarantor; the lenders identified on the signature page thereto (the "Revolving Lenders," and together with the Term Loan Lenders, the "Lenders"); Wells Fargo Bank, National Association, as Lead Arranger and Book Runner; and Wells Fargo Capital Finance, as Administrative Agent and Collateral Agent for the Revolving Lenders (in such capacity, the "Revolving Credit Facility Agent," and together with the Term Loan Agent, the "Agents," and together with the Lenders, the "Secured Parties"), which provides for a senior secured revolving credit facility in the maximum principal amount of $35,000,000. As of the Petition Date, there were no outstanding Revolving Loans (as defined in the Revolving Credit Agreement), and there are outstanding letters of credit in the face amount of $17.6 million (the "Letters of Credit," and together with all interest, fees, costs, and expenses (including attorneys' fees and expenses) and other charges accrued, accruing, or chargeable thereto under the Revolving Credit Documents, (the "Revolving Obligations"), which amounts are due and owing by Debtors, jointly and severally, to Revolving Agent and Revolving Lenders, without defense, counterclaim, or offset of any kind or nature, subject only to the Debtors' rights to seek the return of any portion of the Revolving Cash Reserve in excess of the Debtors' Revolving Obligations in accordance with Section E.(a) above. Prior to the Petition Date, and in accordance with the terms of the Revolving Credit Documents, the Revolving Credit Facility Agent swept approximately $18.5 million of the Debtors' cash (the "Revolving Cash Reserve"), which cash collateralized the outstanding Letters of Credit in an amount equal to 105% of the face amount of such outstanding Letters of Credit.

KE 32104052

e.    <u>Revolving Security Agreement</u>.  In connection with the Revolving Credit Agreement, the Debtors entered into that certain Amended and Restated Credit Facility Pledge and Security Agreement, dated as of October 4, 2013 (as amended, the "<u>Revolving Security Agreement</u>"), by and between the Debtors, as Grantors, and the Revolving Credit Facility Agent, as Collateral Agent.  Pursuant to the Revolving Security Agreement, each Debtor granted the Revolving Credit Facility Agent, as collateral agent for the "Secured Parties" (as defined in the Revolving Credit Agreement, the "<u>Revolving Secured Parties</u>") liens and security interests in the Prepetition Collateral, as security for the Secured Obligations (as defined in the Revolving Security Agreement, and together with the Term Loan Secured Obligations, the "<u>Secured Obligations</u>").

f.    <u>Intercreditor Agreement</u>.  The Agents and the Debtors are parties to that certain Intercreditor Agreement, dated as of October 4, 2013 (the "<u>Intercreditor Agreement</u>"). Pursuant to the Intercreditor Agreement, (i) the Term Loan Agent has a first priority lien and security interest (a "<u>Prepetition First Lien</u>") in the Prepetition Collateral constituting Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and a second priority lien and security interest (a "<u>Prepetition Second Lien</u>," and together with the Prepetition First Liens, the "<u>Prepetition Liens</u>") in the Prepetition Collateral constituting Revolving Priority Collateral (as defined in the Intercreditor Agreement); and (ii) the Revolving Credit Facility Agent has Prepetition First Liens in the Prepetition Collateral constituting Revolving Priority Collateral and Prepetition Second Liens in the Prepetition Collateral constituting Term Loan Priority Collateral. Pursuant to the Intercreditor Agreement, each of the Agents agree that, subject to certain exceptions, neither will object to the other's willingness to permit the use of Cash Collateral constituting Term Loan Priority Collateral or Revolving Priority Collateral, as applicable.

6

g.      Secured Obligations.  The Secured Obligations and the Credit Documents constitute the legal, valid, binding and non-avoidable obligations and agreements of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).  No portion of the Secured Obligations or any payment made to either Agent or the Lenders or applied to the obligations owing under the Credit Documents prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, nature or description pursuant to the Bankruptcy Code or other applicable law.

h.      No Claims.  The Debtors hold no valid or enforceable "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind against either Agent or any of the Lenders.  Each Debtor hereby forever waives and releases any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights against either Agent, each of the Lenders, and each of their respective officers, directors, employees, agents, sub-agents, attorneys, advisors and affiliates, whether arising at law or in equity, under tort (including lender liability) or contract, including recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; *provided*, *however*, that nothing herein shall operate as a release or waiver of any claims or causes of action held by any party (including, without limitation, any of the Debtors) against any Debtor, any "affiliate" of any Debtor (as defined in the Bankruptcy Code) or any officer, director, or direct or indirect shareholder (or affiliate thereof) of any Debtor.

KE 32104052

i.    <u>Prepetition Liens</u>.  The Prepetition Liens granted to the Agents in the Prepetition Collateral pursuant to and in connection with the Credit Documents, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Agents, for each Agent's benefit and for the benefit of the Lenders, (i) are valid, binding, perfected, enforceable and non-avoidable liens and security interests in the Prepetition Collateral to the extent required in the Credit Documents, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) except for the Revolving Cash Reserve, are subject and/or subordinate only to (x) the Carve-Out (as defined herein) and (y) valid, perfected, and unavoidable liens and security interests permitted under the Credit Documents, but only to the extent that such liens and security interests are permitted by the Credit Documents to be senior to or *pari passu* with the applicable Prepetition Liens, and (iv) constitute the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the applicable Credit Documents.

j.    <u>Section 552(b); Section 506(c)</u>.  Subject to entry of the Final Order, each of the Secured Parties are entitled to a waiver of (a) any "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) the provisions of section 506(c) of the Bankruptcy Code.

**BASED ON THE RECORD OF THE INTERIM HEARING, THE FIRST DAY DECLARATION, THE MOTION AND THE DEBTORS' STIPULATIONS, THE COURT FINDS THAT:**

A.    <u>Necessity for Relief Requested; Immediate and Irreparable Harm</u>.  The Debtors requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  The Debtors have an immediate need to use the Cash Collateral to, among other things, permit an orderly wind

down of their distribution business and the orderly continuation and possible sale (the "Sale") of their retail display manufacturing business (the "Retail Display Business"), to maintain the confidence of their Retail Display Business's customers and vendors, and to preserve the going concern value of the Retail Display Business, absent which immediate and irreparable harm will result to the Debtors, their estates, and their creditors. The preservation and maintenance of the Debtors' assets and remaining business is necessary to maximize value. Absent the Debtors' ability to use Cash Collateral, the Debtors would not have sufficient available sources of working capital or financing and would be unable to pay their payroll and other operating expenses, maintain their assets, or proceed with their wind down and Sale efforts, to the severe detriment of their estates and creditors. Accordingly, the relief requested in the Motion and the terms herein are (i) critical to the Debtors' ability to maximize the value of these chapter 11 estates, (ii) in the best interests of the Debtors and their estates, and (iii) necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors, their creditors, and their assets, remaining business, goodwill, reputation, and employees.

B.     Good Cause.  Good cause has been shown for entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors and their estates and creditors. Among other things, the relief granted herein will minimize disruption of the Debtors' remaining business and permit the Debtors to meet payroll and other expenses necessary to effect an orderly wind down of their distribution business and to pursue a possible Sale of assets that maximizes the value of their Retail Display Business. The stipulated terms of the Debtors' use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

KE 32104052

C.    <u>Good Faith</u>.  The Debtors' use of Cash Collateral has been negotiated in good faith and at arms' length among the Debtors and the Agents, and the Agents' consent to the Debtors' use of Cash Collateral shall be deemed to have been made in "good faith."

D.    <u>Notice</u>.  The Debtors have caused notice of the Motion, the relief requested therein, and the Interim Hearing to be served by facsimile, email, overnight courier, or hand delivery on (collectively, the "<u>Notice Parties</u>"):  (a) the U.S. Trustee; (b) the holders of the 35 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) counsel to the Agents; (f) Wells Fargo Bank, N.A.; (g) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c), and (d).

**BASED UPON THE STIPULATED TERMS SET FORTH HEREIN, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.    <u>Motion Granted</u>.  The Motion is GRANTED to the extent provided herein on an interim basis.  Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

2.    <u>Authorization to Use Cash Collateral</u>.  The Debtors are authorized to use the Cash Collateral pursuant to the terms and conditions provided herein.

3.    <u>Budget</u>.

(a)    Except as otherwise provided herein, the Debtors may use Cash Collateral in a manner consistent and in accordance with the cash collateral budget, attached as

KE 32104052

**Exhibit 1** hereto (as the same may be updated in accordance with the terms of this Interim Order, the "Budget"), including, without limitation, for: (i) working capital requirements; (ii) general corporate purposes; and (iii) the costs and expenses (including making adequate protection payments) of administering the Cases (including payments benefiting from the Carve-Out (it being agreed that the payments benefiting from the Carve-Out shall not be limited by the Budget) incurred in the Cases).

(b)        Commencing on the first Monday following the Petition Date (or the next business day if such day is not a business day), and continuing every week thereafter, the Debtors shall be authorized, but not directed, to deliver an updated budget (a "Proposed Budget") to the Term Loan Agent, the Revolving Credit Facility Agent and the Creditors' Committee (on a professional eyes only basis), if any, and the Proposed Budget shall become the Budget with the consent of the Term Loan Agent.

(c)        Except as may be further limited during a Cure Period (as defined below), commencing on a weekly basis as of the end of the fourth full week following the Petition Date:

(i)        the actual amount of Wind-Down Expenditures for the trailing four weeks ending with such week shall not exceed 110% of the budgeted Wind-Down Expenditures in accordance with the Budget for those weeks;

(ii)       the actual amount of Wire Expenditures for the trailing four weeks ending with such week shall not exceed 110% of the budgeted Wire Expenditures in accordance with the Budget for those weeks; and

11

(iii)     the actual Cash of the debtors as of the close of business on Friday of such week shall not be less than: (A) the budgeted end-of-week Cash   in accordance with the Budget, <u>less</u> (B) $3,000,000.

(d)          During any Cure Period, the Debtors may use Cash Collateral only to pay, in accordance with the respective Budget line items, (i) the Carve-Out, (ii) ordinary course payroll obligations and bonus, severance, and incentive compensation approved by the Court, and (iii) necessary expenses that the Debtors have determined, in good faith consultation with the Term Loan Agent, to be critical to the preservation of the Debtors and their estates.

(e)          For the purpose of subparagraphs 3(c)–(e):

(i)     "<u>Wind-Down Expenditures</u>" means expenditures of the Debtors other than (i) Wire Expenditures, (ii) Professional Fees, (iii) payment of prepetition claims authorized by the Court, (iv) adequate assurance deposits, (v) cure payments, (vi) principal and interest payments on account of the Coral Springs Mortgage, and (vii) adequate protection payments, including any interest and principal payments on account of the Term Loan Credit Documents or the Revolving Credit Documents and the professional fees and expenses of the Secured Parties; and

(ii)     "<u>Wire Expenditures</u>" means expenditures of the Debtors in connection with the business of Source Interlink Manufacturing LLC (including continued retail display

12

allowance, retail display pocket allowance, and initial placement offer operations) other than (i) Wind-Down Expenditures, (ii) Professional Fees, (iii) payment of prepetition claims authorized by the Court, (iv) adequate assurance deposits, (v) cure payments, (vi) principal and interest payments on account of the Coral Springs Mortgage, and (vii) adequate protection payments, including any interest and principal payments on account of the Term Loan Credit Documents or the Revolving Credit Documents and the professional fees and expenses of the Secured Parties; and

(iii) "Cash" means the cash held by the Debtors, net of checks and payments in transit and excluding cash held by Wells Fargo Bank, N.A. and cash held in the Professional Fees Reserve and the utility Adequate Assurance Account.[3]

(f) Notwithstanding anything to the contrary set forth in this Interim Order, the Cash Collateral may not be used: (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, contested matter or other litigation of any type (A) against the Agents or the Lenders or seeking relief that would impair the rights and remedies of the Agents or the Lenders under the Credit Documents or this Interim Order, including,

---

[3] "Adequate Assurance Account" shall have the meaning ascribed to it in the *Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (B) Determining Adequate Assurance of Payment for Future Utility Services, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief*, filed on the Petition Date.

without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration, or similar relief that would impair the ability of the Agents or the Lenders to recover on the Secured Obligations or seeking affirmative relief against the Agents or the Lenders related to the Secured Obligations; (B) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Secured Obligations or Agents' liens or security interests in the Prepetition Collateral; or (C) for monetary, injunctive, or other affirmative relief against the Agents, the Lenders, or their respective liens on or security interests in the Prepetition Collateral that would impair the ability of the Agents or the Lenders to assert or enforce any lien, claim, right, or security interest or to realize or recover on the Secured Obligations; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Agents or the Lenders related to the Secured Obligations; (iii) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) against the Agents or the Lenders related to the Secured Obligations or the Prepetition Liens; or (iv) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens or any other rights or interests of the Agents or the Lenders related to the Secured Obligations or the Prepetition Liens; *provided, that*, no more than $50,000 of the proceeds of the Prepetition Collateral may be used by the Creditors'

Committee, if appointed, solely to investigate the foregoing matters within the Challenge Period (as defined herein).

4.        Effect of Stipulation on Third Parties.

(a)        Subject to Paragraph 4(b) hereof, each stipulation, admission, and agreement contained in this Interim Order including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the date of the Petition Date.

(b)        Nothing in this Interim Order shall prejudice the rights of any Creditors' Committee or any other party in interest, if granted standing by the Court, to seek, solely in accordance with the provisions of this Paragraph 4, to assert claims against either Agent or the Lenders, on behalf of the Debtors or the Debtors' creditors or to otherwise challenge the Debtors' Stipulations, including, but not limited to those in relation to (i) the validity, extent, priority, or perfection of the mortgages, security interests, and liens of the Agents or any Lender, (ii) the validity, allowability, priority, or amount of the Secured Obligations, or (iii) any liability of either Agent and/or any Lender with respect to anything arising from the Credit Documents. Any Creditors' Committee or any other party in interest must, after obtaining standing approved by the Bankruptcy Court, commence a contested matter or adversary proceeding raising such claim, objection, or challenge, including, without limitation, any claim or cause of action against either Agent or any Lender (each, a "Challenge") no later than (i) with respect to any Creditors' Committee, the date that is sixty (60) days after the Creditors' Committee's formation, (ii) with

15

respect to other parties in interest, no later than the date that is seventy-five (75) days after the entry of this Interim Order, or (iii) with respect to any chapter 11 trustee appointed in the Debtors' Chapter 11 Cases, or any chapter 7 trustee appointed in any Successor Case, prior to the expiration of the periods set forth in subsections (i) and (ii) above, no later than the date that is the later of (A) fourteen (14) days after the appointment of such trustee or (B) the expiration of the time periods set forth in the foregoing subsections (i) and (ii) above (collectively, the "Challenge Period"). The Challenge Period may only be extended with the written consent of the applicable Agent or the applicable Lender prior to the expiration of the Challenge Period, or by further order of the Court. Only those parties in interest who commence a Challenge within the Challenge Period may prosecute such Challenge. As to (x) any parties in interest, including any Creditors' Committee, who fail to file a Challenge within the Challenge Period, or if any such Challenge is filed and overruled, or (y) any and all matters that are not expressly the subject of a timely Challenge: (1) any and all such Challenges by any party (including, without limitation, any Creditors' Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors' Chapter 11 Cases, or any chapter 7 trustee, any examiner or any other estate representative appointed in any Successor Case), shall be deemed to be forever waived and barred, (2) all of the findings, Debtors' Stipulations, waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to either Agent's and each Lender's claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases, and (3) any and all claims or causes of action against either Agent and/or any Lender, relating in any way to the Credit Documents,

KE 32104052

Secured Obligations, and Prepetition Liens shall be released by the Debtors' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases.

(c)          Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge with respect to the Credit Documents or the Secured Obligations.

5.          Termination Date.  The Debtors' authorization, and the Agents' consent, to use Cash Collateral shall terminate on the earliest to occur of (the "Termination Date"):  (i) the first business day that is 30 days after the Petition Date (unless such period is extended by the Term Loan Agent) if the Final Order has not been entered by this Court on or before such date; (ii) the entry of an order of this Court terminating such right; (iii) the dismissal of any of the Cases or the conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code; (iv) the appointment in any of the cases of a trustee or an examiner with expanded powers; and (v) the expiration of the Cure Period following the delivery of a Default Notice (as defined herein) by the Term Loan Agent or the Revolving Credit Facility Agent, as set forth in Paragraph 11 below.

6.          Reporting Requirements.  The Debtors shall provide the Agents with (a) all reporting and other information required to be provided to the Agents under their respective Credit Documents; (b) a weekly line-by-line variance summary for the immediately preceding weekly period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and disbursements to budgeted cash receipts and disbursements for such periods, so as to actually be received by the Agents within three (3) business days following the end of such period; and (c) every four weeks commencing as of the fifth full week

17

following the Petition Date, revised 13-week cash flow projections substantially in the same form as the cash collateral budget attached hereto as **Exhibit 1** and otherwise in a form reasonably acceptable to the Term Loan Agent so as to be received by the Agents at least three (3) business days before the 13-week period to which they relate.

7.        Insurance.  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral on substantially the same basis as maintained prior to the Petition Date.

8.        Adequate Protection.

(a)        Senior Adequate Protection Liens.  Subject to the Carve-Out in all respects, the terms of this Interim Order, and the Intercreditor Agreement, pursuant to sections 361 and 363(e) of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection for any postpetition diminution in value of each Agent's interests (subject only to the third party rights set forth in Paragraph 4 hereof) in the Debtors' interests in the Prepetition Collateral (including the Cash Collateral) (any "First Lien Diminution in Value" or "Second Lien Diminution in Value," as applicable), each Agent, for the benefit of itself and the Term Loan Lenders, the Revolving Lenders, or any other Secured Parties, as applicable, is hereby granted additional and replacement valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens (the "Senior Adequate Protection Liens or the "Junior Adequate Protection Liens," as applicable, and collectively, the "Adequate Protection Liens") without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on any and all presently owned and hereafter acquired personal property, real property, and all other assets of

18

the Debtors, together with any proceeds thereof (collectively, the "Collateral"), having the priority set forth in Paragraph 8(b) below. Notwithstanding anything herein to the contrary, the Collateral shall not include the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions"), or any proceeds or property recovered in respect of any Avoidance Actions.

        (b)        <u>Priority of Adequate Protection Liens</u>.

        (i)        Subject to the terms of this Interim Order, and the Intercreditor Agreement, the Senior Adequate Protection Liens shall be junior only to the (A) Carve-Out, (B) Prepetition First Liens in favor of each of the Agents, and (C) any other valid, binding, enforceable, non-avoidable, and perfected security interests in or liens on any Collateral existing as of the Petition Date or existing immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code ("Other Prepetition Liens"), except for the Prepetition Second Liens. The Senior Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral (including any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

        (ii)        Subject to the terms of this Interim Order and the Intercreditor Agreement, the Junior Adequate Protection Liens shall be junior only to the (A) Carve-Out, (B) Prepetition First Liens of each of the Agents, (C) Senior Adequate Protection Liens, (D) Prepetition Second Liens of each of the Agents, and (E) Other Prepetition Liens. The Junior Adequate Protection Liens shall otherwise be senior to all other security interests in, liens

on, and claims against any of the Collateral (including any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(iii)        Subject to the Carve-Out in all respects, the terms of this Interim Order, and the Intercreditor Agreement, the Senior Adequate Protection Liens and Junior Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates, and any successors thereto.

(c)        Carve-Out. For purposes hereof, the "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code (and, with respect to the U.S. Trustee, in such amount as is agreed to by the U.S. Trustee or determined by the Court) plus interest at the statutory rate (without regard to the Carve-Out Trigger Notice (as defined herein)); (ii) fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice); (iii) the amount set forth in the wind-down budget (the "Wind-Down Amount"), to be agreed-to between the Debtors and the Term Loan Agent prior to entry of the Final Order; (iv) all accrued but unpaid costs, fees, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") or professionals retained by any official committee appointed in these Cases, including the Creditors' Committee (the "Committee Professionals," and together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Term Loan Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (x) in the case of the Debtor

Professionals, to the extent allowed at any time whether allowed by interim order, procedural order, or otherwise, and (y) in the case of the Committee Professionals, in an aggregate amount not to exceed $100,000 per month, whether allowed by interim order, procedural order, or otherwise (the amounts set forth in the foregoing clauses (x) and (y) are collectively referred to as the "Pre-Termination Amount"); *provided*, that within two (2) days of receiving a Carve-Out Trigger Notice, the Debtors will deliver a written report to the Agents disclosing their then-current estimate of the Pre-Termination Amount; and (v) after the first business day following delivery by the Term Loan Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed (x) with respect to the Debtor Professionals, $800,000 and (y) with respect to the Committee Professionals, $50,000 (the amounts set forth in the foregoing clauses (x) and (y) are collectively referred to as the "Post-Termination Amount," and together with the Pre-Termination Amount, the "Professional Fees Amount"); *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in preceding clauses (ii), (iv), and (v). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Term Loan Agent (or the Revolving Credit Facility Agent if an Event of Default has occurred in accordance with Section 11 herein, which either authorizes the Revolving Credit Facility Agent to deliver a Notice of Default or seek an expedited hearing) to the Debtors and their lead counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, if any, providing notice that the Termination Date has occurred. On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize (i) all cash on hand as of such date and

any available Cash Collateral thereafter held by any Debtor to fund a reserve in an aggregate amount equal to (A) the Pre-Termination Amount *plus* (B) the Post-Termination Amount, and the Debtors shall deposit and hold any such amounts in a segregated account at the Revolving Credit Facility Agent in trust (the "Professional Fees Reserve"); and (ii) after funding of the Professional Fees Reserve, all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Wind-Down Amount, and the Debtors shall deposit and hold any such amounts in a segregated account at the Revolving Credit Facility Agent in trust (the "Wind-Down Reserve").  For the avoidance of doubt, so long as the Carve-Out Trigger Notice shall not have been delivered and subject to clause (iv)(y) of the first sentence of this Paragraph 8(c), the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by this Court.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Credit Documents, the Carve-Out shall be senior to all liens and claims securing the Credit Documents, the Senior Adequate Protection Claims, the Junior Adequate Protection Claims, the Adequate Protection Superpriority Claims (as defined herein), and any and all other forms of adequate protection, liens, or claims securing the Secured Obligations other than the Revolving Cash Reserve.  Further, for the avoidance of doubt and notwithstanding anything herein to the contrary, following a Termination Date, the Secured Parties shall not offset, restrict, foreclose on, or apply cash (including cash received as a result of the sale of any assets) of the Debtors until the Professional Fees Reserve and Wind-Down Reserve have been fully funded, but shall have a first priority, fully perfected, non-avoidable security interest in any residual interest in the Professional Fees Reserve or Wind-Down Reserve, with any excess paid to the Agents for application in accordance with the Credit Documents, as the case may be.

9.          <u>Adequate Protection Superpriority Claims</u>.

(a)          <u>Senior Adequate Protection Superpriority Claim</u>.  Subject to the Carve-Out in all respects, the terms of this Interim Order, and the Intercreditor Agreement, as further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, each Agent is hereby granted, for the benefit of itself and the Term Loan Lenders or the Revolving Lenders, as applicable, an allowed administrative expense claim in these Cases ahead of and senior to any and all other administrative claims in these Cases to the extent of any postpetition First Lien Diminution in Value (the "<u>Senior Adequate Protection Superpriority Claim</u>").

(b)          <u>Junior Adequate Protection Superpriority Claim</u>.  Subject to the Carve-Out in all respects, the terms of this Interim Order, and the Intercreditor Agreement, as further adequate protection, each Agent is hereby granted, for the benefit of itself and the Term Loan Lenders or the Revolving Lenders, as applicable, to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative expense claim in these Cases ahead of any and all other administrative claims in these Cases to the extent of any postpetition Second Lien Diminution in Value (the "<u>Junior Adequate Protection Superpriority Claim</u>, and together with the Senior Adequate Protection Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>").

(c)          <u>Priority of Adequate Protection Superpriority Claims</u>.  Subject to the Carve-Out in all respects, the Senior Adequate Protection Superpriority Claim will not be junior to any claims.  Subject to the Carve-Out in all respects, the Junior Adequate Protection Superpriority Claim will be junior only to the Senior Adequate Protection Superpriority Claim.

KE 32104052

10.        Other Adequate Protection.  Subject to the Carve-Out in all respects, as further adequate protection, (a) the Debtors shall pay to each Agent, for the benefit of itself and the Term Loan Lenders or the Revolving Lenders, as applicable, without further Court order, reasonable attorneys' fees and expenses, whether incurred before or after the Petition Date, of the Term Loan Agent and the Term Loan Lenders or the Revolving Credit Facility Agent, as applicable, to the extent provided under the Term Loan Credit Documents or the Revolving Credit Documents, as applicable and (b) the Revolving Credit Facility Agent shall be authorized to apply Cash Collateral on deposit to any interest, fees, costs and expenses, due and owing by the Debtors to the Revolving Credit Facility Agent and Revolving Lenders to the extent provided by and in accordance with the Revolving Credit Documents, without further order of the Court (the "Adequate Protection Fees").  The Debtors shall serve copies of the invoices supporting the Adequate Protection Fees on the U.S. Trustee and the Creditors' Committee, if any, and any Adequate Protection Fees shall be subject to prior ten (10) day review by the U.S. Trustee and by the Creditors' Committee, if any, and in the event either the U.S. Trustee or the Creditors Committee shall file with this Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court.  If no objection is filed within such ten (10) day review period, such invoice may be paid without further order of the Court and shall not be subject to any further review or challenge.

11.        Events of Default.  The occurrence of any of the following events, unless waived in writing by the Term Loan Agent, shall constitute an event of default (each, an "Event of Default"):

(a)              the Debtors' failure to (i) comply with the Budget, subject to any permitted variances as permitted under Paragraph 3 hereof; or (b) perform,

24

in any material respect, any of their obligations under this Interim Order; in each case where such failure shall have continued unremedied for three (3) business days following receipt of written notice to the Debtors from the Term Loan Agent of such failure;

(b)        dismissal of any of these Cases, conversion of any of these Cases to chapter 7, or the appointment of a chapter 11 trustee or examiner with expanded powers in any of these Cases;

(c)        an order shall be entered staying, reversing, vacating, amending, or rescinding any of the terms of this Interim Order without the consent of the Term Loan Agent as to provisions of this Interim Order which materially affect the Term Loan Lenders or the Term Loan Secured Obligations, or the consent of the Revolving Credit Facility Agent as to provisions of this Interim Order which materially affect the Revolving Lenders or the Revolving Obligations (other than in accordance with the Final Order);

(d)        the Debtors shall have filed with this Court a plan of reorganization without the prior written approval of the Term Loan Agent as to provisions in such plan which materially affect the Term Loan Lenders or the Term Loan Secured Obligations, or the prior written approval of the Revolving Credit Facility Agent as to provisions which materially affect the Revolving Lenders or the Revolving Obligations;

(e)        the Debtors' failure to achieve, in their entireties, any of the following milestones: (i) filing with this Court a motion for approval of an

25

asset purchase agreement (the "<u>Asset Purchase Agreement</u>") and bid procedures for the Sale in form and substance acceptable to the Term Loan Lenders in their sole discretion (the "<u>Bid Procedures Motion</u>") no later than 5 calendar days after the Petition Date; (ii) obtaining Court approval, in form and substance acceptable to the Term Loan Lenders in their sole discretion, of the Bid Procedures Motion no later than 30 calendar days after the Petition Date, (iii) holding an auction with respect to the Sale no later than 80 calendar days after the Petition Date, (iv) obtaining Court approval, in form and substance acceptable to the Term Loan Lenders in their sole discretion, of the Sale no later than 90 calendar days after the Petition Date, and (v) closing the Sale by no later than 120 calendar days after the Petition Date;

(f)        the Asset Purchase Agreement shall have been terminated pursuant to the terms thereof; *provided* that termination of the Asset Purchase Agreement on account of consummation by the Debtors of a higher and better transaction for the Sale shall not be an Event of Default;

(g)        the consummation of a sale of any of the Debtors' assets (other than pursuant to the Sale) not in accordance with de minimis asset sales procedures, to be implemented pursuant to an order entered in the Court, which order shall be negotiated and reasonably agreed to by the Debtors and Term Loan Lenders;

(h)        the entry of a final non-appealable order or judgment by this Court or any other court in any of the Cases: (i) modifying, limiting,

subordinating, or avoiding the priority of the obligations of the Debtors under this Interim Order, the obligations of the Debtors under the Term Loan Agreement and the other Term Loan Credit Documents or the Revolving Credit Agreement and the other Revolving Credit Documents, or the perfection, priority, or validity of the Prepetition First Liens, the Prepetition Second Liens, the Senior Adequate Protection Liens, or the Junior Adequate Protection Liens; (ii) imposing, surcharging, or assessing against the Secured Parties' claims, the Prepetition Collateral, or the Collateral any costs or expenses, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise; (iii) impairing the Term Loan Lenders' or the Term Loan Agent's right to credit bid; or (iv) the obtaining of credit or the incurrence of indebtedness that is secured by a security interest, mortgage, or other lien on all or any portion of the Prepetition Collateral which is equal or senior to any security interest, mortgage, or other lien of the Secured Parties, or entitled to administrative expense priority status which is equal or senior to that granted to the Secured Parties herein; *provided, however*, the Debtors are permitted to grant a claim that is equal to or senior to any such security interest, mortgage, or other lien if such claim is granted to secure postpetition debtor-in-possession financing provided to the Debtors pursuant to section 364 of the Bankruptcy Code that is provided by any of the Lenders and is consented to by their respective Agents in accordance with the Intercreditor Agreement.

KE 32104052

Upon the occurrence and at any time during the continuation of an Event of Default, the Term Loan Agent (or the Revolving Credit Facility Agent with respect to an Event of Default set forth in subsections (b), (c), (d), or (h) above (solely as such Events of Default relate to the Revolving Credit Facility Agent)) may deliver a written notice of an Event of Default (a "Default Notice"), which Default Notice shall be given by email, facsimile, or other electronic means to counsel to the Debtors, counsel to the Revolving Credit Facility Agent, counsel to the Term Loan Agent (if applicable) the U.S. Trustee, and counsel to the Creditors' Committee, if any. The Debtors shall have five (5) business days from the date of delivery of such Default Notice to cure such Event of Default (the "Cure Period"). Except as set forth in Paragraph 3 above, the Debtors' right to use, and the Term Loan Agent's consent to the Debtors' use of, Cash Collateral shall cease as of the expiration of the Cure Period; *provided, however,* that if the Debtors timely cure the Event of Default, the Term Loan Agent shall provide consent, and the Debtors shall thereby be permitted to continue to use Cash Collateral thereafter in accordance with the Budget and the terms of this Interim Order; *provided, further, that,* without limiting Paragraph 13 hereof, nothing in this Interim Order shall in any way prejudice the Debtors' right to seek authority to use the Cash Collateral without the consent of the Term Loan Agent upon the occurrence of a Termination Date. None of the Secured Parties shall object to a request by the Debtors, the Creditors' Committee, or a party in interest for an expedited hearing before the Court to determine whether a Termination Date has in fact occurred. In the event an Event of Default has occurred (other than with respect to subsections (b), (c), (d), or (h) above) and such Event of Default has either been waived or no action has been taken by the Term Loan Agent in accordance with the terms hereof, the Revolving Credit Facility Agent shall have the right to an expedited hearing on two

28

(2) business days' notice, subject to the Court's availability, to contest such waiver or forbearance.

12.     <u>Reversal, Modification, Vacatur, or Stay</u>.  Any reversal, modification, vacatur, or stay of any or all of the provisions of this Interim Order (other than in accordance with the Final Order) shall not affect the validity or enforceability of any Adequate Protection Lien, or any claim, lien, security interest, or priority authorized or created hereby with respect to any Adequate Protection Lien, incurred prior to the effective date of such reversal, modification, vacatur, or stay.  Notwithstanding any reversal, modification, vacatur, or stay (other than in accordance with the Final Order), (a) this Interim Order shall govern, in all respects, any use of Cash Collateral or Adequate Protection Lien or Adequate Protection Superpriority Claim incurred by the Debtors prior to the effective date of such reversal, modification, vacatur, or stay, and (b) the Agents shall be entitled to all the benefits and protections granted by this Interim Order with respect to any such use of Cash Collateral or such Adequate Protection Lien or Adequate Protection Superpriority Claim incurred by the Debtors.

13.     <u>Reservation of Rights</u>.  Notwithstanding anything to the contrary herein, the entry of this Interim Order and the transactions contemplated hereby shall:  (a) be without prejudice to (i) the Debtors' rights to seek the continuing use of Cash Collateral and/or the approval of any debtor-in-possession financing without the consent of the Lenders and (ii) any of the Agents' rights to seek to modify or oppose the same; and (b) not constitute an admission nor be deemed an admission by the Debtors that the terms and conditions of this Interim Order are required to adequately protect any of the Secured Parties in the event the Debtors seek to use Cash Collateral without the consent of any of the Secured Parties.  Except as otherwise expressly set forth herein, the entry of this Interim Order is without prejudice to, and does not constitute a

waiver of, expressly or implicitly, other otherwise impair: (a) any of the Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection (including, without limitation, liens on Avoidance Actions) at the Final Hearing; (b) any of the rights of any of the Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Secured Parties.

14.        No Waiver for Failure to Seek Relief.  The failure or delay of any of the Secured Parties to seek relief or otherwise exercise any of their rights and remedies under this Interim Order, the Term Loan Agreement or the other Term Loan Credit Documents, the Revolving Credit Agreement and the other Revolving Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise, by any or all of the Secured Parties.

15.        Section 507(b) Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to any of the Secured Parties hereunder is insufficient to compensate for any First Lien Diminution in Value or Second Lien Diminution in Value, as applicable, of their respective interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Secured Parties, that the

KE 32104052

adequate protection granted herein does in fact adequately protect any of the Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

16.        **Section 552(b) Waiver.** Subject to entry of the Final Order, the Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and the "equities of the case" exception shall not apply.

17.        **Section 506(c) Waiver.** Subject to entry of the Final Order, the Debtors shall not assert a claim under Bankruptcy Code section 506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by either Agent, for the benefit of the Lenders, upon the Prepetition Collateral.

18.        **Good Faith.** Pursuant to sections 105, 361, and 363 of the Bankruptcy Code, the Agents and Lenders are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Order, and the Agents and Lenders are entitled to the protection provided to such entities under section 363(m) of the Bankruptcy Code.

19.        **Findings of Fact and Conclusions of Law.** This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof. To the extent that any findings of fact are determined to be conclusions of law, such findings of fact shall be adopted as such; and to the extent that any conclusions of law are determined to be findings of fact, such conclusions of law shall be adopted as such.

20.        **Final Hearing.** A hearing on the Debtors' request for a Final Order approving the Motion is scheduled for July 21, 2014, at 2:00 p.m. (prevailing Eastern time) before this Court. Within three (3) business days after entry of this Interim Order, the Debtors

KE 32104052

shall serve, or cause to be served, by first class mail or other appropriate method of service, a copy of the Motion (to the extent the Motion was not previously served on a party) and this Interim Order on (i) the Notice Parties, and (ii) counsel to any Creditors' Committee.  Any responses or objections to the Motion shall be made in writing, conform to the applicable Bankruptcy Rules and Local Rules, be filed with the Bankruptcy Court, set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor, and be served so as to be actually received no later than July 14, 2014, at 4:00 p.m. (prevailing Eastern time) by the following parties:  (a) the U.S. Trustee: 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn: Mark Kenney), facsimile: (302) 573-6497, email: mark.kenney@usdoj.gov; (b) proposed co-counsel for the Debtors: Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654 (Attn: David Eaton and Michael Weitz), facsimile: (312) 862-2200, email: deaton@kirkland.com and michael.weitz@kirkland.com; (c) proposed co-counsel for the Debtors: Young Conaway Stargatt & Taylor, LLP (Attn: Pauline Morgan and Edmon Morton), facsimile: (302) 576-3318 and (302) 576-3320, email: pmorgan@ ycst.com and emorton@ycst.com; (d) counsel for the Term Loan Agent: Ropes & Gray LLP, Prudential Tower, 800 Boylston Street, Boston, MA 02199 (Attn: Alyson Allen) facsimile: (617) 235-0345, email: alyson.allen@ropesgray.com; (e) counsel to the Revolving Credit Facility Agent: Otterbourg P.C., 230 Park Avenue, New York, NY 10169 (Attn: Andrew M. Kramer), facsimile: (212) 682-6104, email: akramer@ otterbourg.com; and (f) counsel to any Creditors' Committee.

21.         <u>Order Effective Upon Entry</u>.  Notwithstanding any applicability of any Bankruptcy Rules, the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

KE 32104052

22.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order in accordance with its terms and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order.

Wilmington, Delaware
Dated: *June 24* 2014

_____
THE HONORABLE KEVIN GROSS
CHIEF UNITED STATES BANKRUPTCY JUDGE

KE 32104052