## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SOURCE HOME ENTERTAINMENT, LLC, *et al.*,[1] | ) Case No. 14-11553 (KG) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 570** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
## CONFIRMATION OF THE DEBTORS' FIRST AMENDED JOINT PLAN
## OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Paul M. Basta, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    paul.basta@kirkland.com

- and -

David L. Eaton (admitted *pro hac vice*)
Michael W. Weitz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    david.eaton@kirkland.com
        michael.weitz@kirkland.com

*Counsel for the Debtors and Debtors in Possession*

Dated: February 17, 2015

Robert S. Brady (DE Bar No. 2847)
Pauline K. Morgan (DE Bar No. 3650)
Edmon L. Morton (DE Bar No. 3856)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    rbrady@ycst.com
        pmorgan@ycst.com
        emorton@ycst.com

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Source Home Entertainment, LLC (8517); Directtou, Inc. (4741); RDS Logistics, LLC (0305); Retail Vision, LLC (2023); Source Interlink Distribution, LLC (3387); Source Interlink International, Inc. (1428); Source Interlink Manufacturing, LLC (7123); and Source Interlink Retail Services, LLC (6967). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida 34134.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 3

I.      The Plan Satisfies the Classification Requirements of Section 1122 of the
        Bankruptcy Code ............................................................................................... 3

II.     The Plan Complies with the Mandatory Requirements of Section 1123(a) ..................... 5

        A.      Section 1123(a)(1)—The Plan Designates Classes of Claims and Interests........... 5

        B.      Section 1123(a)(2)—The Plan Identifies Unimpaired Classes .............................. 5

        C.      Section 1123(a)(3)—The Plan Specifies the Treatment of Impaired
                Classes .......................................................................................................... 6

        D.      Section 1123(a)(4)—The Plan Provides for the Same Treatment of Claims
                and Interests within Each Class ....................................................................... 6

        E.      Section 1123(a)(5)—The Plan Provides for Adequate Means of
                Implementation .............................................................................................. 7

        F.      Section 1123(a)(6)—Provisions Regarding the Debtor's Charter Are
                Inapplicable ................................................................................................... 7

        G.      Section 1123(a)(7)—The Plan Only Contains Provisions Consistent with
                the Interests of Creditors and Interest Holders with Respect to Officers,
                Directors, Members, and Managers ................................................................. 8

III.    Section 1123(b)—The Plan Includes Appropriate Permissive Provisions ....................... 8

        A.      The Plan's Release, Exculpation, and Injunction Provisions Satisfy
                Section 1123(b) of the Bankruptcy Code.......................................................... 9

IV.     Section 1129(a)(2)—The Debtors Have Complied with All Applicable Provisions
        of the Bankruptcy Code ....................................................................................... 16

V.      Section 1129(a)(3)—The Debtors Proposed the Plan in Good Faith .............................. 16

VI.     Section 1129(a)(4)—The Plan Provides for Court Approval of All Payments for
        Services in Connection with These Chapter 11 Cases.................................................... 17

VII.    Section 1129(a)(5)—The Plan Identifies the Plan Administrator.................................... 18

VIII.   Section 1129(a)(6)—The Plan Does Not Implement Any Change to Publicly
        Regulated Rates ................................................................................................. 18

IX.     Section 1129(a)(7)—The Plan Is in the Best Interests of Creditors ................................. 19

X.      Section 1129(a)(8)—Acceptance by Impaired Classes .................................................... 21

XI.     Section 1129(a)(9)—The Plan Complies with the Required Treatment of
        Administrative Claims and Priority Claims ...................................................................... 21

XII.    Section 1129(a)(10)—The Plan Has Been Accepted by at Least One Impaired
        Class of Claims ................................................................................................................ 22

XIII.   Section 1129(a)(11)—The Plan Is Feasible ...................................................................... 22

XIV.    Section 1129(a)(12)—The Plan Provides for Payment of All Statutory Fees ................. 23

XV.     Sections 1129(a)(13)–(16) Are Inapplicable ................................................................... 23

XVI.    The Plan Complies with the Requirements of Section 1129(b) ....................................... 24

        A.      The Plan Is Fair and Equitable ............................................................................. 24

        B.      The Plan Does Not Discriminate Unfairly ............................................................ 25

XVII.   The Technical Modifications to the Plan Should Be Approved Pursuant to
        Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 ................................. 27

XVIII.  Good Cause Exists to Waive the Stay of the Confirmation Order ................................... 28

CONCLUSION .............................................................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*In re 500 Fifth Ave. Assocs.*,
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ............................................................ 4

*In re Aleris Int'l, Inc.*,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ................ 22, 26

*In re Ambanc La Mesa L.P.*,
  115 F.3d 650 (9th Cir. 1997) ........................................................................... 24

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) ............................................................................ 26

*In re Burns & Roe Enters., Inc.*,
  2009 WL 438694 (D.N.J. Feb. 23, 2009) .......................................................... 27

*In re Century Glove, Inc.*,
  No. 90-400 (SLR), 1993 WL 239489 (D. Del. Feb. 10, 1993) ............................ 16, 19

*In re Chateaugay Corp.*,
  89 F.3d 942 (2d Cir. 1996) ............................................................................ 3, 4

*In re Chi. Newspaper Liquidation Corp.*,
  No. 09-11092 (CSS) (Bankr. D. Del. Aug. 17, 2011) ......................................... 16

*In re CHL, Ltd.*,
  No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012) ........................................... 28

*In re Dana Corp.*, 412 B.R. 53 (Bankr. S.D.N.Y. 2008) ........................................ 6

*In re Delta Air Lines, Inc.*,
  370 B.R. 537 (Bankr. S.D.N.Y. 2007),
  aff'd, 374 B.R. 516 (S.D.N.Y. 2007),
  aff'd sub nom. 309 F. App'x 455 (2d Cir. 2009) .............................................. 13

*In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) ............. 16, 28

*In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000) .................................. 6

*In re Dow Corning, Inc.*, 244 B.R 634 (Bankr. E.D. Mich. 1999) ......................... 26

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................. 4

*In re Elsinore Shore Assocs.*,
  91 B.R. 238 (Bankr. D.N.J. 1988) .................................................................. 18

iv

*In re Environdyne Indus., Inc.,*
    No. 93-B310, 1993 WL 566565 (Bankr. N.D. Ill. Dec. 20, 1993) ................................. 26

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) ............................................................... 10, 26

*In re Future Energy Corp.,*
    83 B.R. 470 (Bankr. S.D. Ohio 1988) ................................................................ 18

*In re Gatehouse Media, Inc.,*
    No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) ...................................... 28

*In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 (Bankr. S.D.N.Y. July 2, 2014)................ 14

*In re Genesis Health Ventures, Inc.,*
    266 B.R. 591 (Bankr. D. Del. 2001) ................................................................ 26

*In re Geokinetics Inc.,*
    No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ...................................... 28

*In re Global Safety Textiles Holdings LLC,*
    2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ........................................ 27

*In re Heritage Org., L.L.C.,*
    375 B.R. 230 (Bankr. N.D. Tex. 2007)............................................................... 4

*In re Indianapolis Downs LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) ................................... 13, 14

*In re Int'l Aluminum Corp.,*
    No. 10–10003 (MFW), 2010 WL 2904996 (Bankr. D. Del. Apr. 30, 2010)................... 26

*In re Jersey City Med. Ctr.,*
    817 F.2d 1055 (3d Cir. 1987)............................................................................ 4

*In re Johns-Manville Corp.,*
    68 B.R. 618 (Bankr. S.D.N.Y. 1986),
    aff'd sub nom., 78 B.R. 407 (S.D.N.Y. 1987),
    aff'd sub nom., 843 F.2d 636 (2d Cir. 1988) ............................................. 17, 25

*In re Johnston,*
    21 F.3d 323 (9th Cir. 1994) ............................................................................. 3

*In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984) ....................................... 17

*In re Mann Farms,*
    917 F.2d 1210 (9th Cir. 1990) ........................................................................ 17

*In re Mcorp Fin., Inc.,*
    137 B.R. 219 (Bankr. S.D. Tex. 1992),
    dismissed on other grounds, 139 B.R. 820 (S.D. Tex. 1992) ........................................... 25

*In re Multiut Corp.*, 449 B.R. 323, 351–53 (Bankr. N.D. Ill. 2011)............................................. 26

*In re Natural Land Corp.,*
    825 F.2d 296 (11th Cir. 1987) ....................................................................................... 17

*In re P.J. Keating Co.*, 168 B.R. 464, 468 (Bankr. D. Mass. 1994) ............................................. 25

*In re Physiotherapy Holdings, Inc.,*
    No. 13-12965 (KG) (Bankr. Dec. 23, 2013) ............................................................. 16, 28

*In re Premier Int'l Holdings, Inc.,*
    2010 WL 2745964, (Bankr. D. Del. Apr. 29, 2010) ......................................................... 16

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000)...................................................................................... 14, 15

*In re Resorts Int'l, Inc.,*
    145 B.R. 412 (Bankr. D.N.J. 1990) ................................................................................ 17

*In re Spansion, Inc.,*
    426 B.R. 114 (Bankr. D. Del. 2010) ............................................................................... 14

*In re Sun Country Dev., Inc.,*
    764 F.2d 406 (5th Cir. 1985) .......................................................................................... 16

*In re Wash. Mut., Inc.,*
    442 B.R. 314 (Bankr. D. Del. 2011) ............................................................................ 6, 10

*In re Zenith Elecs. Corp.,*
    241 B.R. 92 (Bankr. D. Del. 1999) .............................................................................. 9, 10

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)................................................................................... 3, 4, 24

*Kane v. Johns-Manville Corp.,*
    843 F.2d 636 (2d Cir. 1988)................................................................................... 16, 22

**Statutes**

11 U.S.C. § 1114.......................................................................................................................... 23

11 U.S.C. § 1122.................................................................................................................. 3, 5, 27

11 U.S.C. § 1122(a) .................................................................................................................... 3, 5

11 U.S.C. § 1122(b) ........................................................................................................... 4

11 U.S.C. § 1123 .......................................................................................................... 3, 27

11 U.S.C. § 1123(a) ........................................................................................................... 5

11 U.S.C. § 1123(a)(1) ...................................................................................................... 5

11 U.S.C. § 1123(a)(2) ...................................................................................................... 5

11 U.S.C. § 1123(a)(4) ...................................................................................................... 6

11 U.S.C. § 1123(a)(5) ...................................................................................................... 7

11 U.S.C. § 1123(a)(6) .................................................................................................. 7, 8

11 U.S.C. § 1123(a)(7) ...................................................................................................... 8

11 U.S.C. § 1123(b)(1) ...................................................................................................... 9

11 U.S.C. § 1123(b)(2) ...................................................................................................... 9

11 U.S.C. § 1123(b)(3) ...................................................................................................... 9

11 U.S.C. § 1123(b)(6) ...................................................................................................... 9

11 U.S.C. § 1125 ............................................................................................................. 16

11 U.S.C. § 1126 ............................................................................................................. 16

11 U.S.C. § 1126(c) ......................................................................................................... 21

11 U.S.C. § 1126(d) ......................................................................................................... 21

11 U.S.C. § 1126(f) ......................................................................................................... 21

11 U.S.C. § 1126(g) ......................................................................................................... 21

11 U.S.C. § 1127 ............................................................................................................. 27

11 U.S.C. § 1127(a) ......................................................................................................... 27

11 U.S.C. § 1129(a) ......................................................................................................... 24

11 U.S.C. § 1129(a)(1) ...................................................................................................... 3

11 U.S.C. § 1129(a)(10) ................................................................................................... 22

11 U.S.C. § 1129(a)(11) .............................................................................................. 22, 23

11 U.S.C. § 1129(a)(12) ................................................................................................ 23

11 U.S.C. § 1129(a)(13) .......................................................................................... 23, 24

11 U.S.C. § 1129(a)(15) ................................................................................................ 24

11 U.S.C. § 1129(a)(16) ................................................................................................ 24

11 U.S.C. § 1129(a)(2) .................................................................................................. 16

11 U.S.C. § 1129(a)(4) .......................................................................................... 17, 18

11 U.S.C. § 1129(a)(5) .................................................................................................. 18

11 U.S.C. § 1129(a)(6) .......................................................................................... 18, 19

11 U.S.C. § 1129(a)(7) .......................................................................................... 19, 20

11 U.S.C. § 1129(a)(8) .......................................................................................... 21, 24

11 U.S.C. § 1129(a)(9) .......................................................................................... 21, 22

11 U.S.C. § 1129(b) ........................................................................................ 21, 24, 25

11 U.S.C. § 1129(b)(1) .................................................................................................. 24

11 U.S.C. § 1129(b)(2)(B) ............................................................................................. 24

11 U.S.C. § 1129(b)(2)(B)(ii) ........................................................................................ 25

11 U.S.C. § 1129(b)(2)(C) ....................................................................................... 24, 25

11 U.S.C. § 1129(b)(2)(C)(ii) ........................................................................................ 25

11 U.S.C. § 326(a) ........................................................................................................ 19

11 U.S.C. § 328 ............................................................................................................. 18

11 U.S.C. § 329 ............................................................................................................. 18

11 U.S.C. § 330 ............................................................................................................. 18

11 U.S.C. § 331 ............................................................................................................. 18

11 U.S.C. § 363 ............................................................................................................... 9

11 U.S.C. § 365 ............................................................................................................... 9

11 U.S.C. § 365(f) ......................................................................................................... 28

11 U.S.C. § 503(b) ................................................................................................... 18

11 U.S.C. § 507(a) ................................................................................................... 21

11 U.S.C. § 524(e) ................................................................................................... 14

11 U.S.C. 503(b)(2) ................................................................................................. 19

28 U.S.C. § 1930(a) ................................................................................................. 23

**Other Authorities**

H.R. Rep. No. 95-595 (1977),
    *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 ..................................................... 3

S. Rep. No. 95-989 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ................................................... 16

**Rules**

Fed. R. Bankr. P. 1019(2) ........................................................................................ 20

Fed. R. Bankr. P. 3002(c) ........................................................................................ 20

Fed. R. Bankr. P. 3019 ............................................................................................ 27

Fed. R. Bankr. P. 3020 ............................................................................................ 28

Fed. R. Bankr. P. 3020(e) ........................................................................................ 28

Fed. R. Bankr. P. 6004(h) ........................................................................................ 28

Fed. R. Bankr. P. 6006(d) ........................................................................................ 28

Fed. R. Bankr. P. 9019 ......................................................................................... 9, 15

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully submit this memorandum of law (this "<u>Memorandum</u>") in support of confirmation of the *Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 570] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2]  In support of confirmation of the Plan, the Debtors respectfully state as follows.[3]

## PRELIMINARY STATEMENT

1.    The Debtors commenced these Chapter 11 Cases on June 23, 2014, with two important goals:  (a) maximizing stakeholder value through the sale of the retail display business and the liquidation of their remaining assets; and (b) administering these Chapter 11 Cases in an efficient and responsible manner that maximizes creditor recoveries through a confirmed chapter 11 plan.  The Debtors achieved that first goal when they consummated the $24 million sale of substantially all of the assets of the retail display business.[4]  The Debtors now stand ready to complete their second goal through confirmation of the Plan.

2.    Shortly after the Petition Date, the Debtors engaged in extensive good faith, arm's-length negotiations with the Committee, Source Media, the Revolving Lenders, the Term Loan Lenders, and other parties in interest in order to reach a consensual settlement of numerous issues and potential claims in these Chapter 11 Cases.  These substantial negotiations among highly sophisticated parties resulted in an agreement in principle to resolve these

---

[2]    Capitalized terms used but not otherwise defined in this Memorandum have the meanings set forth in the Plan.

[3]    The facts and circumstances supporting the confirmation of the Plan are set forth more fully in the *Declaration of Stephen Dubé in Support of Confirmation of the Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Dubé Declaration</u>"), and in the *Declaration of Michael J. Hill Regarding Analysis of Ballots for Accepting or Rejecting Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Voting Report</u>"), each of which were filed contemporaneously herewith and are incorporated herein by reference.

[4]    *See generally Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Certain of the Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of  Certain Contracts, and (D) Granting Related Relief* [Docket No. 319] and [Docket No. 391] (notice of closing).

Chapter 11    Cases    consensually    through    a    value-maximizing    transaction (the "Global Resolution").

3.    The Global Resolution is implemented through the Plan.  Among other things, it enables a distribution to certain Holders of Allowed General Unsecured Claims and otherwise facilitates the resolution of these Chapter 11 Cases on terms supported by every major party in interest.  The material terms of the Global Resolution include:

- Certain Term Loan Lenders or Source Media parties will provide $4.5 million in cash to fund pro rata recoveries on account of Allowed General Unsecured Claims held by Participating GUC Holders.

- Without this $4.5 million cash contribution, the Debtors submit that Holders of Allowed General Unsecured Claims would likely receive *no* recovery.

- To be a Participating GUC Holder, the creditor must consent to the Plan's release package, which includes mutual third-party releases by and among Source Media and the Term Loan Lenders, among others.

- Non-Participating GUC Holders that opt out of the Plan's release package will still be released from any Avoidance Actions, but they will not receive any portion of the $4.5 million cash contribution.

4.    The Plan and the Global Resolution have received overwhelming support. The Global Resolution is supported by every major stakeholder in these Chapter 11 Cases, including the Debtors, the Committee, the Term Loan Lenders, the Revolving Lenders, Source Media and its lenders, the Coral Springs Lender, key Holders of General Unsecured Claims, and other material parties in interest.  Indeed, no party in interest has objected to the Plan.

5.    The two classes entitled to vote on the Plan—namely, Class 4 and Class 5— accepted the Plan and the Global Resolution by a significant margin.  Specifically, the Debtors' final voting results on the Plan were as follows (all percentages are with respect to votes actually cast):[5]

---

[5]    Voting Report Ex. A.

| Class | Number Voted to Accept | Amount Voted to Accept |
|---|---|---|
| Class 4—Term Loan Claims | 100% | 100% |
| Class 5—General Unsecured Claims | 92.1% | 98.5% |

The Debtors respectfully submit that the Plan should be confirmed, and believe that the Plan maximizes value for creditors and is in the best interest of the Debtors' Estates.

## ARGUMENT

6.      Under section 1129(a)(1) of the Bankruptcy Code, a chapter 11 plan must comply with all applicable provisions of the Bankruptcy Code.  Legislative history indicates that this subsection embodies and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests as well as the requisite mandatory contents of a plan.[6]  As demonstrated below, the Plan complies with both sections 1122 and 1123, and all other applicable provisions, of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code and merits confirmation.

## I.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

7.      Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class."  By its plain language, section 1122(a) prohibits only the classification of dissimilar claims in the same class.[7]  As such, courts have broad discretion to determine the propriety of classification schemes in light of the facts of each case.[8]  Debtors may

---

[6]    *See* H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368.

[7]    *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").

[8]    *See In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994).

also classify certain claims for purposes of administrative convenience.[9]    Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[10]

8.    The Plan organizes Claims and Interests into nine different Classes (except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which the Plan appropriately does not classify).[11]    Each Class consists of substantially similar Claims or Interests.    In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.    Namely, the Plan separately classifies the Other Priority Claims (Class 1), Other Secured Claims (Class 2), Revolving Credit Facility Claims (Class 3), Term Loan Claims (Class 4), General Unsecured Claims (Class 5), Intercompany Claims (Class 6), Section 510(b) Claims (Class 7), Intercompany Interests (Class 8), and Holdings Interests (Class 9) because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted

---

[9]    *See* 11 U.S.C. § 1122(b).

[10]    Courts have identified grounds justifying separate classification, including: (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification. *John Hancock*, 987 F.2d at 158–59 (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also In re Chateaugay*, 10 F.3d at 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.    It does not require that similar classes be grouped together . . . .").

[11]    *See* Plan, Art. III.A.

from such classification.[12]  The Plan appropriately classifies Interests separate from Claims, and all Holders of Holdings Interests receive the same treatment under Class 9.[13]  Secured Claims are classified separately from unsecured Claims because the Debtors' obligations with respect to the former are secured by collateral.  Secured Claims are further grouped into Classes based on, for instance, the collateral securing the Claim (against which the secured claimant has recourse subject to the provisions of the Bankruptcy Code) and the governing credit documents under which the Claim arises.  Unsecured Claims are grouped according to priority and based on other factors including the nature of the claimants' relationships with the Debtors.  Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

## II.    The Plan Complies with the Mandatory Requirements of Section 1123(a)

9.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

### A.    Section 1123(a)(1)—The Plan Designates Classes of Claims and Interests

10.    For the reasons set forth above, Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[14]

### B.    Section 1123(a)(2)—The Plan Identifies Unimpaired Classes

11.    Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired—Classes 1, 2, and 3.[15]

---

[12]    *See id.*

[13]    *See* Plan, Art. III.B.

[14]    *See* Plan, Art. III.A.

[15]    *See* Plan, Art. III.A.2.

C.     **Section 1123(a)(3)—The Plan Specifies the Treatment of Impaired Classes**

12.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired—Classes 4, 5, 6, 7, 8, and 9.[16]

D.     **Section 1123(a)(4)—The Plan Provides for the Same Treatment of Claims and Interests within Each Class**

13.     Section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan provide the same treatment for each claim or interest in a particular class. The Plan satisfies this requirement by providing the same treatment to every Claim or Interest in each particular Class.[17]

14.     Although the ultimate distribution to Holders in Class 5 turns on whether or not such Holder elects to be a Participating GUC Holder, such treatment comports with section 1123(a)(4) of the Bankruptcy Code because each Holder of a Class 5 Claim has the same opportunity to receive equal treatment.[18] Here, each Holder in Class 5 had the same opportunity to become a Participating GUC Holder and receive a Cash distribution equal to its Pro Rata share of the GUC Reserve, or to instead to become a Non-Participating GUC Holder by opting out of the Third Party Release. Holders of Class 5 Claims made this election through the Court-approved solicitation process.[19] The Plan thus satisfies section 1123(a)(4) of the Bankruptcy Code with respect to Class 5 because Holders of Allowed Class 5 Claims necessarily

---

[16]     *See* Plan, Art. III.B.

[17]     *See* Plan, Art. III.B.

[18]     *See, e.g. In re Wash. Mut., Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4) … [w]hat is important is that each claimant within a class have the *same opportunity to receive equal treatment*") (emphasis added); *In re Dana Corp.*, 412 B.R. 53, 62 (Bankr. S.D.N.Y. 2008) ("[t]he key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity"); *In re Dow Corning Corp.*, 255 B.R. 445, 532 (E.D. Mich. 2000) ("there is no violation of § 1123(a)(4) by restricting the settlement option to those [claimants] who agree to give up all of their claims").

[19]     *See* Disclosure Statement Order.

receive the same rights and treatment as other Holders of Allowed Class 5 Claims within such class.

### E.    Section 1123(a)(5)—The Plan Provides for Adequate Means of Implementation

15.    Section 1123(a)(5) of the Bankruptcy Code requires a chapter 11 plan to "provide adequate means for the plan's implementation."    Article IV of the Plan, as well as other provisions thereof, satisfies this requirement by setting forth specific means for the Plan's execution and implementation, including:    (a) the substantive consolidation of the Debtors' estates for purposes of Confirmation and Consummation; (b) the sources of consideration for Plan distributions, including funds held in the Administrative and Priority Claims Reserve and the GUC Reserve; (c) the designation of the Plan Administrator and the GUC Administration Oversight Committee and the maintenance of the Post-Effective Date Debtor; (d) the means by which the Post-Effective Date Debtor will fulfill its obligations under the Plan, including the Plan Administrator Agreement and the Post-Effective Date Debtor Reserve; (e) the general authority for all corporate actions necessary to effectuate the Plan; (f) the dissolution of the Debtors' existing boards of directors; (g) the dissolution of the Debtors other than Holdings, which shall mean the Post-Effective Date Debtor on and after the Effective Date; (h) the exemption from certain taxes and fees to the extent provided in the Plan; (i) the preservation of Causes of Action to the extent not released, exculpated, or enjoined under the Plan; and (j) the authorization to implement the Wind Down in accordance with the Plan and the Plan Administrator Agreement.    In particular, the Debtors believe that the Administrative and Priority Claims Reserve, the GUC Reserve, and the Post-Effective Date Debtor Reserve more than adequately provide the funding required under the Plan.    As such, Article IV of the Plan sets forth adequate means of implementation of the Plan.

### F.    Section 1123(a)(6)—Provisions Regarding the Debtor's Charter Are Inapplicable

16.    Section 1123(a)(6) of the Bankruptcy Code requires that a corporate debtor's chapter 11 plan provide for the inclusion in the reorganized debtor's charter of a prohibition

against the issuance of non-voting equity securities and related protections for holders of preferred shares. The Plan is a liquidating plan and does not provide for the issuance of equity or other securities by the Debtors. Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to the Plan.

> **G.    Section 1123(a)(7)—The Plan Only Contains Provisions Consistent with the Interests of Creditors and Interest Holders with Respect to Officers, Directors, Members, and Managers**

17.     Section 1123(a)(7) of the Bankruptcy Code provides that a chapter 11 plan must "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." Article IV.H of the Plan provides that upon the Effective Date or as soon as reasonably practicable thereafter, the existing boards of directors and managers, as applicable, of the Debtors other than the Post-Effective Date Debtor shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members and any and all remaining officers or directors of each Debtor other than the Post-Effective Date Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders of such Debtor, or the officers and directors of such Debtor. Article IV of the Plan satisfies the requirement of section 1123(a)(7) by providing for the continuation of the Post-Effective Date Debtor and the appointment of the Plan Administrator to act for the Post-Effective Date Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions of the Plan. Similarly, Article IV of the Plan provides for the appointment of the GUC Administration Oversight Committee.

## III.    Section 1123(b)—The Plan Includes Appropriate Permissive Provisions

18.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and

unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[20]

19.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, and 3 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the holders of Claims and Interests within such Classes.  On the other hand, Classes 4, 5, 6, 7, 8, and 9 are Impaired since the Plan modifies the rights of the holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.  In addition and under section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides for the rejection of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except as otherwise provided under the Plan.

### A.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code

20.     The Plan also includes certain releases, an exculpation provision, and an injunction provision.  These discretionary provisions are proper because, among other things, they are the product of extensive good faith, arm's-length negotiations, are supported by the Debtors and their key constituents, formed an essential part of the Global Resolution and the Plan (including the decision to fund the GUC Reserve Amount), and were overwhelmingly accepted by holders of Claims entitled to vote on the Plan.[21]    Accordingly, the releases, exculpation, and injunction represent critical components of an appropriate Plan, are valid exercises of the Debtors' business judgment under Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code, and are permissible under section 1123(b)(6) of the Bankruptcy Code.

---

[20]    *See* 11 U.S.C. § 1123(b)(1)–(3), (6).

[21]    *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (outlining the factors to be considered in evaluating the propriety of a debtor release).

### 1.    The Debtor Release Should Be Approved

21.    Article VIII.D of the Plan includes a debtor release (the "Debtor Release"). Courts in this jurisdiction typically assess the propriety of a debtor release in light of five "*Zenith* factors" in the context of a chapter 11 plan:

> a.    an identity of interest between the debtor and the third party, such that a suit against the third party is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> b.    substantial contribution by the third party to the plan;
>
> c.    the essential nature of the release to the debtor's plan;
>
> d.    an agreement by a substantial majority of creditors to support the plan and the release; and
>
> e.    provision in the plan for payment of all or substantially all of the claims of the creditors and interest holders under the plan.[22]

No factor is dispositive, nor is a proponent required to establish each factor required for the release to be approved.[23]

22.    The Debtors submit that the first four *Zenith* factor support the Debtor Release, and that, as explained more fully below, the Debtor Release complies the goals of the fifth *Zenith* factor by providing for distributions to Participating GUC Holders where there would otherwise be no payments available for such creditors.

23.    ***First***, litigation undertaken against the parties otherwise benefitting from the release will unquestionably reduce assets available for distribution under the Plan.  Again, the Debtor Release is an essential component of the Global Resolution by which the Debtors stand to return significant value to their stakeholders.  Without that Global Resolution, and as discussed

---

[22]    *In re Zenith Elecs. Corp.*, 241 B.R. at 110.

[23]    *See In re Wash. Mut., Inc.*, 442 B.R. at 346 ("These factors . . . simply provide guidance in the [c]ourt's determination of fairness.");  *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that factors are not exclusive or conjunctive requirements).

at length herein, the Debtors' Estates could have easily been mired in protracted and ultimately uncertain litigation that would deplete the Estate's already minimal funds, and Holders of General Unsecured Claims would not have the opportunity to receive any consideration on account of such Claims.

24.     The Debtors, after reviewing volumes of relevant documents and consulting with their professionals and advisors, believe that the outcome of any litigation with respect to the Causes of Action released pursuant to the Plan and the Global Resolution is, at best, highly uncertain.  The Debtors have thoroughly evaluated the merits of such Causes of Action and undertaken a preliminary analysis of the legal and factual issues that would be presented in such litigation.  The Debtors believe that these issues would be highly complex and would require substantial development, and thus any expectation of a favorable outcome in this litigation is entirely speculative.  For example, litigation of avoidance actions against certain of the Debtors' creditors would require complicated inquiries into the Debtors' prepetition arrangements with such creditors and a sophisticated analysis of the Debtors' financial condition at the time of certain transactions—a task that is particularly difficult given the state of the Debtors' books and records and their limited financial resources.  The Debtors in their reasonable business judgment believe that success on account of the released Causes of Action is highly uncertain, and thus pursuing such Causes of Action would likely result in depletion of Estate assets.

25.     *Second*, the Debtor Release is predicated on substantial contributions by the parties benefitting from that release.  In the first instance, the Debtor Release includes parties that have provided direct benefits to these Chapter 11 Cases through diligently discharging their duties and contributing to the overall success of these Chapter 11 Cases.  In addition, the $4.5 million cash funding recoveries for Participating GUC Holders will come directly from the

parties benefiting from the release or from collateral securing obligations owed to the such parties—in fact, the only reason that any recovery is available for Holders of General Unsecured Claims is the contribution by these parties.    Moreover, each Released Party is obliged to mutually release the Debtors and their Estates from causes of action that might otherwise be asserted against the Debtors' Estates.[24]    Particularly when measured against the limited value of the released claims or causes at issue, such agreements constitute "substantial consideration" supporting the Debtor Release here.

26.    ***Third***, the Debtor Release is absolutely essential to the Plan itself.    As noted above, the Debtor Release is a critical component of the Global Resolution that, in turn, forms the basis for the Debtors' entire Plan and any recoveries for Holders of General Unsecured Claims.    Through that Global Resolution, the Debtors could resolve what may have otherwise involved complex, costly, and ultimately uncertain litigation and provide their stakeholders with immediate recoveries.    Without the Debtor Release, the Debtors do not believe that the manifest benefits arising under the Global Resolution and the Plan would be possible.

27.    The Debtors, the Committee, the Term Loan Lenders, the Revolving Lenders, Source Media, and other parties in interest negotiated the Global Resolution with the intention that it would represent a consensual settlement of issues and claims involving a number of parties and facilitate the resolution of these Chapter 11 Cases.    Given the progress by parties in interest in resolving the most complex issues in these Chapter 11 Cases, to unwind that progress in order to litigate these issues would result in undue delay and substantial costs that would further erode the minimal Estate funds available for distribution to creditors.    This factor therefore supports approval with respect to the Debtor Release.

---

[24]    *See* Plan Art.I.A.115.

28.     **Fourth**, creditors support the Debtor Release.  As noted in the Voting Report, of the voting creditors, 100 percent of the creditors in Class 4 support the Plan, and more than 92 percent in number and more than 98 percent in value of creditors in Class 5 support the Plan. This level of support provides clear evidence that the Plan, including the releases that are an indispensable Plan feature, maximizes the value of the Estates.[25]

29.     **Finally**, while the Plan does not provide "full" recoveries to unsecured creditors, the Plan provides at least some recovery to that constituency, which is greater than the lack of any recovery at all which the Debtors believe would likely be the result in the absence of the Global Resolution.  As noted above, the creditor recoveries under the Global Resolution were possible only because of the Debtor Release and the Third Party Release implemented by the Plan—indeed, the parties to the Global Resolution expressly conditioned successful negotiations on such provisions.  The value arising from this proposition is evident:  definite consideration achieved now in exchange for remote and uncertain value (and, in the Debtors' good faith estimation, likely no material value) only attainable after lengthy and costly litigation.  Given the critical nature of the Debtor Release to the Plan, the creditors' tremendous support for the Plan can only demonstrate tremendous support for the Debtor Release.  The Debtor Release should therefore be approved.

### 2.     The Third Party Releases Should Be Approved

30.     Article VIII of the Plan provides narrow and appropriately tailored third party releases that apply only to consenting parties and, therefore, should be approved.  Generally, a chapter 11 plan may provide for a consensual release of claims by third parties. The determination as to whether a third party release is consensual ultimately relies on the particular circumstances at issue in a particular case.[26]  Nor is affirmative consent to a third party

---

[25]    *See In re Delta Air Lines, Inc.*, 370 B.R. 537, 544 (Bankr. S.D.N.Y. 2007), *aff'd*, 374 B.R. 516 (S.D.N.Y. 2007), *aff'd sub nom.* 309 F. App'x 455 (2d Cir. 2009) (finding that approximately 90 percent, in amount and number, of bondholders voting in favor of a chapter 11 plan demonstrated "overwhelming support" for the settlement that was incorporated in and made part of the plan).

[26]    *See In re Indianapolis Downs LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013).

release (as opposed to opting out of that release) required for such release to be "consensual."[27] Thus, unimpaired creditors receiving a full recovery under a plan may be deemed to have consented to a third party release.[28]    Similarly, a third party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.[29]

31.    The Third Party Release and the corresponding Release By Third Party Releasees in Article VIII.E and Article VIII.F of the Plan (collectively, the "Third Party Releases") are fully consensual.  Only Holders of Claims that are Unimpaired (and receiving full recoveries) under the Plan or that are entitled to vote to accept or reject the Plan yet do not opt out of the Third Party Releases will grant these releases.  In other words, every party potentially bound by the Third Party Releases is either Unimpaired (and will receive payment in full) or had the opportunity and necessary information to decide whether to opt out of the Third Party Releases, and the Plan appropriately recognizes those who did not opt out as having granted the release.[30] For these reasons, the Third Party Releases should be approved.

### 3.    The Exculpation Should Be Approved

32.    The Debtors respectfully submit that inclusion of non-Estate fiduciaries in their proposed Exculpation in Article VIII.G of the Plan is both fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases.  In *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000), the Third Circuit rejected any "per se rule barring any provision in a reorganization plan limiting the liability of third parties" by virtue of section

---

[27]    *See id.*; *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010).

[28]    *See id.*

[29]    *See Indianapolis Downs*, 486 B.R. at 306; *Spansion*, 426 B.R. at 144; *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. July 2, 2014).

[30]    *See Indianapolis Downs*, 486 B.R. at 306 ("[T]he record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the [t]hird [p]arty [r]eleases may be properly characterized as consensual and will be approved.").

524(e) of the Bankruptcy Code when it assessed a plan exculpation in that case.[31] The Third Circuit was clear that, where a plan seeks to limit liability, such as through exculpation, such provisions must be assessed in light of the particular circumstances at issue— in that case, the particular duties and obligations imposed on a creditors' committee's members per section 1103(c) of the Bankruptcy Code.[32]

33.    The particular facts and circumstances of these Chapter 11 Cases warrant the inclusion of non-Estate fiduciaries in the Exculpation here.  Through the efforts of such parties, the Plan will provide significant and, in some cases, complete recoveries to creditors.  Each of the Released Parties (who are also beneficiaries of the Exculpation) has participated constructively in these Chapter 11 Cases, including, for example, in the successful sale of the Debtors' retail display business and in the development of the consensual Plan, including by directly participating in negotiations and funding distributions.  The Debtors submit that these contributions support the fairness of exculpating the Released Parties.  Moreover, the Exculpation provides the finality and certainty that the Released Parties sought in negotiating the Global Resolution, and its inclusion in the Plan effectuates the fundamental deal struck by the parties.  The Debtors therefore respectfully submit that the Exculpation is amply warranted under both *PWS* and pursuant to the Global Resolution implemented through the Plan.

### 4.    The Injunction Provision Should Be Approved

34.    The injunction provision set forth in Article VIII.H of the Plan implements the Plan's release and exculpation provisions, in part, by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Post-Effective Date Debtor, or any other entity released or exculpated under the Plan on account of or in connection with or with respect to any such Claims or Interests compromised or settled to the Plan.  The injunction provision is thus a key provision of the Plan because it enforces the release and exculpation

---

[31]    *See PWS*, 228 F.3d at 247.

[32]    *See id.*

provisions that are centrally important to the Plan.  As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision must also be appropriate.  Moreover, this injunction provision is narrowly tailored to achieve its purpose, and similar injunctions have been approved by courts in other chapter 11 cases.[33]

## IV.    Section 1129(a)(2)—The Debtors Have Complied with All Applicable Provisions of the Bankruptcy Code

35.    Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a chapter 11 plan "comply with the applicable provisions of [chapter 11]."  Section 1129's legislative history explains this provision as incorporating the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[34]  The Debtors have solicited acceptances and rejections of the Plan and made certain technical modifications to the Plan in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and the Debtors believe that they have satisfied the requirements of section 1129(a)(2).

## V.    Section 1129(a)(3)—The Debtors Proposed the Plan in Good Faith

36.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  The Bankruptcy Code does not define "good faith," but courts have identified the following as demonstrating good faith: (a) the debtor's "reasonable hope of success;"[35] (b) a showing that the plan was proposed with "honesty and good intentions;"[36] (c) the existence of "a reasonable likelihood that the plan will

---

[33]    *E.g.*, *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. Dec. 23, 2013) (stating that injunctions in the plan were necessary to preserve and enforce the releases and exculpations granted by the plan and were narrowly tailored to achieve that purpose); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Chi. Newspaper Liquidation Corp.*, No. 09-11092 (CSS) (Bankr. D. Del. Aug. 17, 2011) (same); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (same).

[34]    *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912.

[35]    *In re Century Glove, Inc.*, No. 90-400 (SLR), 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

[36]    *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (citations omitted).

achieve a result consistent with the objectives and purposes of the Bankruptcy Code;"[37] and (d) whether the debtor used its bankruptcy filing to abuse the judicial process in contravention of the purposes and policies of the Bankruptcy Code.[38]  In determining whether a debtor proposed a plan in good faith, a court should consider the totality of the circumstances.[39]

37.    The Debtors respectfully submit that the record of these Chapter 11 Cases and the Dubé Declaration establish that they have proposed the Plan in good faith, with the legitimate purpose of maximizing stakeholder value, and not by any means forbidden by law.  The Plan provides for the distribution of value to creditors and ensures for payment in full of Allowed Administrative and Priority Claims.  The Plan achieves this goal without the necessity of protracted litigation with interested parties.  The Plan has also received overwhelming support from Holders of Claims in both of the voting classes.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(3) of the Bankruptcy Code.

## VI.    Section 1129(a)(4)—The Plan Provides for Court Approval of All Payments for Services in Connection with These Chapter 11 Cases

38.    Section 1129(a)(4) of the Bankruptcy Code requires that a payment "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  Courts have construed this section as requiring the bankruptcy court's review and approval of the reasonableness of all professional fee payments made from estate assets.[40]

39.    The Plan requires Professionals seeking professional fees arising before the Effective Date to file requests for allowance of those fees with the Court no later than the first Business Day that is 45 days after the Effective Date, and Professional Fee Claims ultimately

---

[37]    *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (citations omitted).

[38]    *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987).

[39]    *See In re Mann Farms*, 917 F.2d 1210, 1214 (9th Cir. 1990).

[40]    *See, e.g., In re Resorts Int'l, Inc.*, 145 B.R. 412, 475 (Bankr. D.N.J. 1990); *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986), *aff'd sub nom.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*, 843 F.2d 636 (2d Cir. 1988).

remain subject to approval of this Court.[41]    Accordingly, the Plan complies with section 1129(a)(4).[42]

## VII.    Section 1129(a)(5)—The Plan Identifies the Plan Administrator

40.    Section 1129(a)(5) of the Bankruptcy Code requires that (a) the proponent of a chapter 11 plan disclose the identity of any individual proposed to serve after confirmation as a director, officer, or voting trustee of the debtor, (b) the appointment of such individuals comply with the interests of creditors and shareholders and with public policy, and (c) the proponent disclose the identity of any insider that the reorganized debtor will employ and the nature of the compensation provided to that insider.

41.    Because the Plan provides for the liquidation of the Estates' assets and dissolution of the Debtors, section 1129(a)(5) of the Bankruptcy Code is inapplicable.    In any event, Article IV of the Plan satisfies the requirements of section 1129(a)(5), to the extent applicable, by providing for the appointment of the Plan Administrator.    The form of *Plan Administrator Agreement*, filed with the Court on February 6, 2015 [Docket No. 618, Ex. C], discloses the identity and compensation of the proposed Plan Administrator—namely, Joshua Korsower, the Debtors' current Chief Financial Officer.    The Debtors submit that the relevant parties, including the Committee, negotiated the Plan Administrator Agreement in good faith, and that Mr. Korsower is qualified to act in the role of the Plan Administrator.

## VIII.    Section 1129(a)(6)—The Plan Does Not Implement Any Change to Publicly Regulated Rates

42.    Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission with jurisdiction over the rates of a debtor approve any changes in rate regulations provided in a chapter 11 plan.    Because the Debtors are not subject to any such regulation and

---

[41]    *See* Plan, Art. II.C.

[42]    *Cf. In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that a bankruptcy plan satisfies section 1129(a)(4) when it provides for payment of "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by various Bankruptcy Code provisions—e.g., §§ 328, 329, 330, 331 and 503(b)—and need not be explicitly provided for in a Chapter 11 plan.").

the Plan does not propose any rate changes, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

## IX.    Section 1129(a)(7)—The Plan Is in the Best Interests of Creditors

43.    The "best interests" test of section 1129(a)(7) of the Bankruptcy Code requires that holders of impaired claims or interests that do not vote to accept a chapter 11 plan "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [title 11] on such date." Thus, if the Court finds that each non-consenting member of an Impaired Class would receive at least as much under the Plan as it would receive in a hypothetical chapter 7 liquidation, then the Plan satisfies the best interests test.[43]

44.    Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the best interest test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan, although recoveries for Participating GUC Holders under the Plan are materially greater due to the funding of the GUC Reserve. Indeed, as set forth herein, the Debtors submit that Holders of Allowed General Unsecured Claims likely would not be entitled to any recovery but for the Global Resolution and the $4.5 million cash contribution. Liquidating the Debtors' Estates under the Plan will provide Holders of Allowed General Unsecured Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases.[44] The conversion to chapter 7 would also

---

[43]    *See Century Glove*, 1993 WL 239489, at *7.

[44]    *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

require entry of a new bar date.[45]  Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

45.    Critically, the funding of the GUC Reserve Amount is solely the result of the Global Resolution, which is to be implemented through a chapter 11 plan, and such a recovery pool would not be available in a chapter 7 liquidation.  The Debtors, in consultation with the Committee, have determined after a lengthy and comprehensive analysis of potential Estate assets (including Causes of Action) that, taking into account the additional expenses of a chapter 7, there likely would be no assets of value to distribute to Holders of General Unsecured Claims in a chapter 7 liquidation.  Therefore, without the additional consideration provided as a result of the Global Resolution, there likely would be no recovery at all for such Holders.  Furthermore, the substantive consolidation of the Debtors' Estates provided for in Article IV.A of the Plan results in the equitable distribution of the GUC Reserve Amount to Participating GUC Holders, whereas in a chapter 7 many entities would not have claims against Debtors with even hypothetical assets and would receive no distributions.

46.    Moreover, distributions under the Plan reflect various accommodations provided by the Term Loan Lenders to pay Priority Claims, which must be paid in full before the Debtors can make any distributions to the voting classes.  The Debtors believe that such accommodations would not be available in a chapter 7 liquidation.

47.    As demonstrated by the overwhelming number of votes in support of the Plan in both of the voting classes, the Debtors' creditors fully expect to recover as much or more value under the Plan on account of their Claims, as of the Effective Date, than the amount they would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  The Debtors therefore submit that the Plan is in the best interests of all creditors and accordingly satisfies section 1129(a)(7) of the Bankruptcy Code.

---

[45]    *See* Fed. R. Bankr. P. 1019(2); 3002(c).

## X.        Section 1129(a)(8)—Acceptance by Impaired Classes

48.      Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests established under a chapter 11 plan either accept the plan or not be impaired under the plan.  A class of claims accepts a plan if holders of at least two-thirds in dollar amount and a majority in number of voting claims in that class vote to accept the plan.[46]  The Bankruptcy Code conclusively presumes that an unimpaired class of claims or interests accepts the plan.[47]  Conversely, the Bankruptcy Code deems classes of claims or interests that do not receive or retain any property under a plan as rejecting that plan.[48]

49.      As set forth in the Voting Report, Classes 4 and 5 voted to accept the Plan.  On the other hand, Classes 6, 7, 8, and 9 (collectively, the "Deemed Rejecting Classes") did not accept the Plan because each is deemed to have rejected the Plan.  Nevertheless, although the Debtors have not satisfied section 1129(a)(8) of the Bankruptcy Code, the Court may still confirm the Plan because, as described more fully below, it does not discriminate unfairly against any Class and treats the Deemed Rejecting Classes fairly and equitably, thus satisfying section 1129(b) of the Bankruptcy Code.

## XI.        Section 1129(a)(9)—The Plan Complies with the Required Treatment of Administrative Claims and Priority Claims

50.      Section 1129(a)(9) of the Bankruptcy Code requires that claimholders entitled to priority treatment under section 507(a) of the Bankruptcy Code receive cash payments under a chapter 11 plan unless such claimholders agree to different treatment.  Article II of the Plan provides that Holders of Allowed Administrative Claims and Allowed Priority Tax Claims Claims will receive a cash distribution in full satisfaction of their Claims.  The Debtors believe that the Administrative and Priority Claims Reserve is sufficient to satisfy Allowed Priority Claims.  The Debtors' established the Administrative and Priority Claims Reserve Amount in

---

[46]   *See* 11 U.S.C. § 1126(c); *see also* 11 U.S.C. § 1126(d) (governing classes of interests).

[47]   *See* 11 U.S.C. § 1126(f).

[48]   *See* 11 U.S.C. § 1126(g).

consultation with the Committee and with the consent of the Term Loan Agent.  In addition, to the extent that funds held in the Professional Fee Escrow are unable to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals after application of funds held in the Professional Fee Escrow, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which Allowed Administrative Claim shall be satisfied in full in accordance with the Plan.  The Plan therefore satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

## XII.  Section 1129(a)(10)—The Plan Has Been Accepted by at Least One Impaired Class of Claims

51.  Section 1129(a)(10) of the Bankruptcy Code requires that at least one class of impaired claims vote to accept the chapter 11 plan, without including any acceptance by an insider.  As evidenced by the Voting Report, Classes 4 and 5 voted to accept the Plan.  As such, at least one Impaired Class of Claims has accepted the Plan for each Debtor, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

## XIII.  Section 1129(a)(11)—The Plan Is Feasible

52.  Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  Section 1129(a)(11) does *not* require the Debtors to guarantee the Plan's complete success.  Instead, and to satisfy the feasibility requirement, the Debtors must show that the Plan has a *reasonable* chance of success.[49]

---

[49]  *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *27–29 (Bankr. D. Del. May 13, 2010).  *Accord Kane*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

53.     The Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code with a straightforward and sound mechanism for its implementation.  In the first instance, the Debtors will contribute approximately $3,584,537 of funds to the Administrative and Priority Claims Reserve, established to satisfy Allowed Administrative and Priority Claims.  The Debtors will also establish and fund the Professional Fee Escrow in order to pay Professional Fee Claims.  Furthermore, the Plan calls for the Post-Effective Date Debtor Distribution on the Effective Date in order to fund the obligations of the Plan Administrator. The GUC Reserve shall also fund the GUC Administration Costs incurred by the Plan Administrator and GUC Administration Oversight Committee.  The Debtors established the amount each of the foregoing reserves with the consent of, or in consultation with, the Term Loan Agent and the Committee.  The Debtors have therefore sufficiently established that the Post-Effective Date Debtor will have sufficient funds to satisfy all requirements and obligations under the Plan.

## XIV.    Section 1129(a)(12)—The Plan Provides for Payment of All Statutory Fees

54.     Section 1129(a)(12) of the Bankruptcy Code requires that a debtor either directly pay all fees required under section 1930(a) of the Judicial Code, as determined by the bankruptcy court at the confirmation hearing, or provide in its chapter 11 plan for the payment of all such fees on the effective date of the plan.  The Plan provides that the Debtors or the Post-Effective Date Debtor, as applicable, will pay all fees required under 28 U.S.C. § 1930(a) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.[50]  Accordingly, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

## XV.     Sections 1129(a)(13)–(16) Are Inapplicable

55.     Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all retiree benefits (as defined in section 1114 of the Bankruptcy Code).  The Debtors will not have any obligations to pay such retiree benefits after consummation of the Plan and, as such,

---

[50]     *See* Plan, Art. II.D.

section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.  Likewise, sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to debtors that are individuals and thus do not apply here.  Finally, section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are nonprofit entities or trusts and thus are inapplicable.

**XVI.  The Plan Complies with the Requirements of Section 1129(b)**

56.    Because of the Deemed Rejecting Classes, the Plan has not satisfied the requirements of section 1129(a)(8) of the Bankruptcy Code.  The Debtors therefore request confirmation of the Plan under section 1129(b) of the Bankruptcy Code, the "cramdown" provision, with respect to any Class that rejects the Plan.   Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[51]  The Plan satisfies section 1129(b) of the Bankruptcy Code.

**A.    The Plan Is Fair and Equitable**

57.    The Plan provides "fair and equitable" treatment to the Deemed Rejecting Classes in accordance with section 1129(b) of the Bankruptcy Code.   Sections 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code set forth the requirements of the "fair and equitable" test with respect to unsecured creditors and equity holders, with each subsection specifying an alternative requirement.  A chapter 11 plan only needs to satisfy one of those requirements in

---

[51]    *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

order to be considered fair and equitable with respect to a dissenting class of unsecured creditors or equity interests.[52]

58.     The Plan satisfies the "fair and equitable" standard with respect to the Deemed Rejecting Classes by meeting the requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code.  These sections permit cramdown of a rejecting class where the holder of any claim or interest that is junior to the interests of such rejecting class does not receive or retain under a chapter 11 plan any property on account of its junior claim or interest.  Under the Plan, no Holder of any Claim or Interest junior to the Claims and Interests of the Deemed Rejecting Classes will receive a distribution.

59.     Furthermore, to the extent that judicial decisions have articulated an uncodified aspect of the "fair and equitable" standard requiring classes senior to a non-assenting class to receive no more than 100 percent of the value of their claims, the Plan satisfies such requirement.[53]  Under the Plan, no Class will receive more than the full amount of their Claims. Based on the foregoing, the Debtors respectfully submit that the Plan satisfies the "fair and equitable" standard.

### B.     The Plan Does Not Discriminate Unfairly

60.     The "unfair discrimination" standard of section 1129(b) of the Bankruptcy Code requires that a dissenting class receive "treatment which allocates value to the [dissenting] class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor,"[54] so that "a dissenting class will receive relative value equal to the value given to all other similarly situated classes."[55]  From the outset, it should be noted that the

---

[52]   *See In re P.J. Keating Co.*, 168 B.R. 464, 468 (Bankr. D. Mass. 1994) (noting that the "test under Section 1129(b)(2)(C) is an alternative one").

[53]   *See, e.g., In re Mcorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("If former stockholders' interests are eliminated, a valuation is required to make sure that the senior classes of claims are not being provided for more than in full."), *dismissed on other grounds*, 139 B.R. 820 (S.D. Tex. 1992).

[54]   *Mcorp*, 137 B.R. at 234.

[55]   *Johns-Manville*, 68 B.R. at 636.

Bankruptcy Code does not require absolutely equal treatment among similarly situated classes, nor does the Bankruptcy Code prohibit discrimination among classes in the first instance. Rather, the Bankruptcy Code prohibits only discrimination that is "unfair."[56]

61.    The Bankruptcy Code does not define "unfair discrimination."[57]  Many courts have, in turn, utilized the so-called "*Dow Corning*" factors, under which a determination as to whether "unfair" discrimination exists may be determined by reference to:

> (1) a dissenting class; (2) another class of the same priority; a difference in the plan's treatment of the [a dissenting class and another class of the same priority] that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.[58]

62.    Courts typically examine the facts and circumstances of the particular case to make the determination.[59]  A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is similarly situated to a class allegedly receiving more favorable treatment.[60]

63.    In this case, Claims in the Deemed Rejecting Classes are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  The Plan's treatment of the Deemed Rejecting Classes is proper because no similarly

---

[56]    *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) ("The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair.'").

[57]    *See In re Environdyne Indus., Inc.*, No. 93-B310, 1993 WL 566565, at *36 (Bankr. N.D. Ill. Dec. 20, 1993).

[58]    *In re Dow Corning, Inc.*, 244 B.R 634, 710–11 (Bankr. E.D. Mich. 1999) (subsequent history omitted); *see also Exide Techs.*, 303 B.R. at 79–80 (using a test substantially similar to *Dow Corning*); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 611 (Bankr. D. Del. 2001) (same).

[59]    *See, e.g., In re Multiut Corp.*, 449 B.R. 323, 351–53 (Bankr. N.D. Ill. 2011) (considering various facts and circumstances of the case in determining whether unfair discrimination existed).

[60]    *See Aleris*, 2010 WL 3492664, at *31 (citing *Armstrong*, 348 B.R. at 121); *see also In re Int'l Aluminum Corp.*, No. 10–10003 (MFW), 2010 WL 2904996 (Bankr. D. Del. Apr. 30, 2010) (noting that unfair discrimination requires that classes of "similar legal rights . . . receiv[e] different treatment," and that classes cannot be said to be "similarly situated" where the classes have a "different legal nature and priority").

situated class will receive more favorable treatment. Accordingly, the Plan does not discriminate—unfairly or otherwise—against any of the Deemed Rejecting Classes.

### XVII. The Technical Modifications to the Plan Should Be Approved Pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019

64.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder. Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[61]

65.    The Debtors modified the Plan by clarifying three typographical, definitional errors. The technical modifications are immaterial and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Moreover, each of the Committee and the Term Loan Agent had notice and opportunity to object to the technical modifications, but did not do so. Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the technical modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

---

[61]    *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

## XVIII. Good Cause Exists to Waive the Stay of the Confirmation Order

66.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

67.     The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[62]  As noted above, these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information, and, as a result, there have been no objections to Confirmation of the Plan.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.  For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' wind down process so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## CONCLUSION

**WHEREFORE,** based on the foregoing, the Debtors respectfully request that the Court enter an order confirming the Plan.

---

[62]   *See, e.g., In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same); *In re CHL, Ltd.*, No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012) (same).

Wilmington, Delaware
Dated:  February 17, 2015

*/s/ Ryan M. Bartley*
Robert S. Brady (DE Bar No. 2847)
Pauline K. Morgan (DE Bar No. 3650)
Edmon L. Morton (DE Bar No. 3856)
Ryan M. Bartley (DE Bar No. 4985)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        rbrady@ycst.com
              pmorgan@ycst.com
              emorton@ycst.com
              rbartley@ycst.com

- and -

Paul M. Basta, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        paul.basta@kirkland.com

- and -

David L. Eaton (admitted *pro hac vice*)
Michael W. Weitz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        david.eaton@kirkland.com
              michael.weitz@kirkland.com

*Counsel for the*
*Debtors and Debtors in Possession*